Walter SANDERS, Petitioner,

v.

James E. SULLIVAN, Respondent.

No. 85 Civ. 4014 (CBM).

United States District Court,
S.D. New York.

Jan. 8, 1988.

nal possession of a weapon in the second degree (N.Y.Penal L. § 265.03 (McKinney 1982)), and criminal possession of a weapon in the third degree (N.Y.Penal L. § 265.02 (McKinney 1982)).

Sanders appealed his conviction to the Appellate Division, First Department, claiming error in the discharge of a juror during the trial and prosecutorial misconduct. The First Department affirmed the conviction without opinion on January 31, 1984. *People v. Sanders*, 99 A.D.2d 686, 471 N.Y.S.2d 727 (1984). Sanders was denied leave to appeal to the New York Court of Appeals on May 16, 1984.

On October 9, 1984, Sanders moved for relief pursuant to N.Y.Crim.Proc.L. § 440.10 (McKinney 1983), alleging ineffective assistance of counsel and knowing use of perjured testimony by the prosecutor. The Supreme Court, New York County, denied the motion without a hearing on March 8, 1985, and Sanders' application for leave to appeal was denied.

Sanders advances four grounds for habeas relief in his petition to this court, filed April 22, 1985: (1) Prosecutorial misconduct in insinuating that a witness did not exist whom the prosecutor knew had testified before the grand jury and whose testimony at trial would have been exculpatory; (2) Improper discharge of the jury foreperson at the close of the Government's case when she stated that she could not vote to return a guilty verdict; (3) Ineffective assistance of counsel; and (4) The prosecutor's knowing use of perjured testimony.[1]

It is apparent from the foregoing that Sanders has exhausted his state remedies with respect to the claims in his petition. He pursued the first two claims to the New York Court of Appeals, where leave to appeal was denied; as for the second two claims, there is no appeal as of right of the denial of a § 440.10 *coram nobis* motion. N.Y.Crim.Proc.L. § 450.15 (McKinney 1983).

Henry Putzel, III, Obermaier, Morvillo & Abromowitz, P.C. by Alan J. Brudner, New York City, for petitioner Walter Sanders.

Robert M. Morgenthau, Dist. Atty., New York County by Marc Frazier Scholl, Robert M. Raciti, New York City, for respondent James E. Sullivan.

## OPINION

MOTLEY, District Judge.

Walter Sanders petitions this court, pursuant to 28 U.S.C. § 2254(a) (1982), for a writ of habeas corpus to set aside an April 19, 1982 judgment of the New York Supreme Court, New York County, Hon. Fritz W. Alexander II, J., convicting him, after a jury trial, of manslaughter in the second degree (N.Y.Penal L. § 125.15 (McKinney 1987)), two counts of robbery in the first degree (N.Y.Penal L. § 160.15 (McKinney 1975)), robbery in the second degree (N.Y. Penal L. § 160.10 (McKinney 1975)), crimi-

---

1. The State's Memorandum in Opposition to Petition for a Writ of Habeas Corpus was docketed with this court on August 8, 1985; a Supplemental Memorandum was docketed on December 11, 1985.

In an opinion filed January 21, 1987, this court found that Sanders' claims of ineffective assistance and prosecutorial use of perjured testimony required an evidentiary hearing, and granted Sanders's motion for appointment of counsel. The hearing was held on June 19, 1987. Counsel for Sanders filed proposed findings of fact and conclusions of law on August 17, 1987; the State's proposed findings and conclusions were received in chambers on August 18, 1987; petitioner's reply to those proposed findings and conclusions was filed on August 31, 1987; and a brief by the State in reply to petitioner's proposed findings and conclusions was received in chambers on September 1, 1987.

FACTS

The facts underlying the offense of which petitioner was convicted are as follows. Petitioner and his accomplice, one Omar Sabir (also known as Bruce Thomas), who were ostensibly interested in a drug buy, approached Carmelo Perez, a known drug dealer, in the hallway outside the Harlem apartment in which Perez lived with his common-law wife, Irma Semiday. Petitioner claimed at trial that he and Sabir were trying to buy drugs from Perez, as instructed by a man petitioner knew only as "Eric," who had entrusted him with $500 for the purchase. Perez, however, claimed that petitioner and Sabir proceeded to rob him at gunpoint. Sabir's views remain unknown, because he was killed by a gunshot during the dispute that broke out between the two visitors and Perez. According to Perez, both petitioner and Sabir confronted him in the hallway and then fired their guns across the hall in the general direction of Irma Semiday when she opened her door to see what was happening outside the apartment. There was evidence at trial that one of the shots fired from petitioner's gun hit and killed Sabir. Petitioner, taking the stand in his own de-

fense, contested this version of the events, claiming that he did not fire the shot that killed Sabir and, indeed, denying that he even possessed a gun on the day of the shooting. According to petitioner, the fatal shot was fired by Irma Semiday who, having armed herself, surreptitiously reopened her door.

DISCUSSION

I. *Discharge of the Jury Foreperson*

■ On February 23, 1982, after the State rested on its direct case, the jury foreperson, Ms. Peggy Fybish, asked to be excused from further service because she "had become prejudiced and could no longer serve as a fair and impartial juror." Transcript, *People v. Sanders*, Indictment No. 5530–80, at 471 (hereinafter Transcript). The court immediately conducted a hearing on this request, found that the juror's self-assessment was correct, and ordered her discharged, as it had the power and obligation to do under N.Y.Crim.Proc. L. § 270.35 (McKinney 1982).[2] Petitioner claims that this was error.

A federal habeas court's power to review the factual findings of a state court is limited. Under 28 U.S.C. § 2254(d), this court must presume the correctness of the state court's factual findings unless one of eight enumerated circumstances obtains. 28 U.S.C. § 2254(d)(1)–(8). Under the last of these circumstances—that this court, on examination of the relevant parts of the record, should "conclude[ ] that [the state court's] factual determination is not fairly supported by the record," it would of course be compelled to find the state court in error.

We can, however, draw no such conclusion from the record. Petitioner asserts that the discharge of Ms. Fybish violated his right to a fair trial. He observes, quite correctly, that jurors necessarily form tentative conclusions at every stage in a trial, and argues that Ms. Fybish differed from

---

2. Section 270.35 provides, in pertinent part:
 If at any time after the trial jury has been sworn and before the rendition of its verdict, a juror is unable to continue serving by reason of illness or other incapacity, or for any other reason is unavailable for continued service, or the court finds, from facts unknown at the time of selection of the jury, that a juror is grossly unqualified to serve in the case or has engaged in misconduct of a substantial nature, but not warranting the declaration of a mistrial, the court must discharge such juror.

the other jurors in this case only by being more vociferous in expressing those tentative opinions. This court cannot agree. The minutes of the hearing disclose that Ms. Fybish had been experiencing a combination of extrajudicial problems. She was consistently late for trial, supposedly because she had not been receiving her unemployment checks and was very low on money. Transcript at 477. The day of the hearing she complained that she had broken her glasses and would not be able to see if they broke again. *Id.* More importantly, Ms. Fybish expressed more than the merely tentative conclusions each juror necessarily forms throughout a case. She asserted that she found many features of the People's case to be "inconsistent, incredible, unbelievable," *id.* at 473. She had developed the conviction that without the introduction of the murder weapon into evidence or at least an explanation of its disappearance, petitioner could not be convicted, *id.* at 480–81, even though petitioner was charged with crimes of which possession of a weapon is not an element. Although she said her mind was "not totally shut," *id.* at 480, when asked by the trial judge "[Y]ou are saying you have already made up your mind about the case, is that the long and short of it?," *id.* at 476, she responded "That is the long and short of it, yes sir. I just have grave doubts in my mind...." *Id.* On these facts, under the presumption of correctness established by § 2254(d), this court holds that the trial court was well within the limits of § 270.35 in discharging this juror. *Cf. People v. Perkins,* 124 Misc.2d 1060, 478 N.Y.S.2d 789, 790 (1984) (discharge of jurors who would suffer severe economic hardship justified).

In any case, Ms. Fybish was replaced by an alternate juror who had been present throughout the trial. If, as petitioner maintains, Ms. Fybish was still capable of impartiality, the trial court merely "replaced one impartial juror with another impartial juror," an action that surely cannot have deprived petitioner of his right to a fair trial.[3]

## II. *Prosecutorial Misconduct*

 Throughout the trial, petitioner tried to establish that he and Sabir had not been robbing Perez when Sabir was shot but had been purchasing drugs at the request of, and with money supplied by, a man named "Eric." "Eric," petitioner claims, is one Eric Grant, who was incarcerated at the time of petitioner's trial and had in fact testified before the grand jury. Petitioner argues that by referring to Eric as "last name unknown" on a number of occasions,[4] the "prosecutor erred in suggesting that a witness upon whom the defense case rested did not exist.... [The prosecutor], in bad faith, engaged in a bold attempt to characterize appellant's testimony as a complete lie." Petition at 4–C.

This court is unable to accept petitioner's contentions. Each reference to "Eric" complained of by petitioner can be construed as an attempt to cast doubt on the strength of the alleged friendship between petitioner and Eric, rather than as an attempt to cast doubt on Eric's existence. Two examples should suffice.

---

**3.** *People v. Culhane,* 33 N.Y.2d 90, 108 n. 3, 350 N.Y.S.2d 381, 398 n. 3, 305 N.E.2d 469, 481 n. 3 (1973). The clear analysis set forth by the New York Court of Appeals in this footnote deserves more extensive quotation:

It is almost always wise for a trial court to err on the side of disqualification.... Even if a juror is wrongly but not arbitrarily excused, the worst the court will have done in most cases is to have replaced one impartial juror with another impartial juror. On the other hand, to deny discharge for cause of an obviously biased juror ... does more than prejudice the party against whom the bias

runs. It casts a doubt on the legitimacy of the verdict even before the trial begins.

Unquestionably, in the present case the trial judge discharged his duty under § 270.35 and *Culhane.*

**4.** Petitioner's Proposed Findings of Fact and Conclusions of Law submitted to this court mention only one instance, in the prosecutor's closing statement. *Id.* at 32. Petitioner's brief in the Appellate Division supplies six more colorable examples from petitioner's cross-examination. *People v. Sanders,* Brief for Defendant–Appellant at 19–22.

Q: There was a man you were to recruit at your friend Eric's request, is that correct?

A: That is correct.

Q: You were going to find a friend [that is, Sabir] to help you find five hundred dollars worth of cocaine, is that correct?

A: That's right.

Q: This is the same Eric whose last name you didn't know, correct?

A: That is correct.

Q: He solicited you to go and commit a crime, correct, buying drugs?

A: Yes, sir.

. . . . .

Q: So, for thirty dollars you felt it was sufficient payment to not only involve yourself in a criminal act but to go and involve yet another person in the same criminal act, is that correct?

Transcript at 583–84.

Q: At what time were you to meet Eric that night, to give him his cocaine?

. . . . .

A: Right after we made the deal.

. . . . .

Q: Where?

A: At his house.

. . . . .

Q: I see. Is that where you went to look for Eric?

A: Yes, but not that night.

Q: You mean you had five hundred of his dollars and you had no arrangement to give it back to him should the deal not be able to be consummated?

A: No.

. . . . .

Q: You had no arrangement with that person whose last name you didn't know, to give him either back his money or his narcotics on the very night that he purchased it?

Transcript at 604–05. The first of these passages will clearly bear an interpretation on which the prosecutor's implicit message is "Come, now, you don't really expect us to believe you are so stupid that you'd risk a drug bust for only thirty dollars from somebody whose last name you don't even know"; the second can plausibly be read to carry the sardonic implication "Come, now, you don't really expect us to believe that Eric is so stupid he'd entrust you with $500 and not have a plan to get it or the drugs, when you don't even know each other well enough to know his last name." Certainly the prosecutor was trying to cast doubt on petitioner's story, but not necessarily by trying to cast doubt on Eric's existence. Each remark complained of can be construed as nothing but fair comment on the implausibility of petitioner's version of the events, pointing out weaknesses in petitioner's testimony about Sabir's death. This court concludes that petitioner has not made a showing of prosecutorial bad faith.[5]

### III. *Ineffective Assistance of Counsel*

■ In its opinion of January 21, 1987, this court determined that petitioner had set forth a prima facie case for a claim of ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984). As is now familiar, *Strickland* sets out a two-pronged test for ineffective assistance. The petitioner must show that "counsel's representation fell below an ob-

---

**5.** Petitioner's brief to the Appellate Division, referred to in his petition, also argues that when the prosecutor first raised the question of "Eric"'s last name, he had unfairly suggested that it was petitioner's burden to locate and produce "Eric." *People v. Sanders,* Brief for Defendant–Appellant at 19; *see* Transcript at 574–76. If the prosecutor was in fact making such a suggestion, it was not improper. "The prosecutor is entitled to comment on a defendant's failure to call witnesses to contradict the factual character of the government's case...." *United States v. Bubar,* 567 F.2d 192, 199 (2d Cir.), *cert. denied,* 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977) (citation omitted); *United States v. Dioguardi,* 492 F.2d 70, 81–82 (2d Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974). No danger was presented here to petitioner's right against self-incrimination. Nor did any alleged prosecutorial comment involve privileged materials or excluded evidence. *See United States v. Jabara,* 618 F.2d 1319, 1328 (9th Cir.1980) (prosecutor's comment on failure to call witness proper when it did not involve breach of privilege or reference to excluded evidence).

jective standard of reasonableness," *id.* at 688, 104 S.Ct. at 2065, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. at 2068. This court granted an evidentiary hearing with respect to one aspect of counsel's representation of petitioner—her failure to call as a witness at trial Ms. Ella Mae Richardson, "whose account of her own observations of the crime scene as reflected in her statement to the police would have tended to place in serious doubt the testimony of the State's key witnesses." *Sanders v. Sullivan*, 701 F.Supp. 996, 999 (S.D.N.Y.1987).[6]

Having had that evidentiary hearing, the court finds that counsel's failure to call Ms. Richardson was within the scope of a reasonable trial strategy. The unsigned but handwritten statement Ms. Richardson gave to the police on the night of the shooting says, in substance, that Ms. Richardson looked out of her window and saw two women and a young man being chased by a man she recognized who was carrying a black pistol. She claimed that this man lived with "a lot of dogs" in the left rear first-floor apartment of 76 East 119th Street. Petitioner's Exhibit 3. A single page of notes in another hand, which petitioner suggests is that of Detective Ronald Lockwood, Petitioner's Proposed Findings of Fact and Conclusions of Law at 16, also exists and was introduced at the hearing as Petitioner's Exhibit 4. Assuming that these notes reflect an interview with Ms. Richardson, she said on that occasion that she saw two females and one male running from a building being chased by a man of medium height, wearing a beige plaid jacket or sweater, with a black gun. A circled

notation on this page indicates that the man lived on the first floor, left rear, was five feet five or six inches in height and had short curly hair and a medium complexion.

Petitioner would have this court draw the inference that this man was Carmelo Perez from the fact that Perez kept a number of dogs and had taken some of them with him that evening as he made his rounds selling cocaine.

If one draws that inference and credits Ms. Richardson, petitioner contends,

> This testimony would have placed a gun in Perez's hand on the night of the killing, would have called Perez's own credibility into question (Perez and Semiday both denied owning a gun) ... and might have supported an inference that Perez disposed of the weapon his wife had just used to shoot Sabir. The gun might have been argued to be Perez's own, used like his dogs for protection during drug sales.

Petitioner's Proposed Findings and Conclusions at 19.[7] At the June 19, 1987 evidentiary hearing, Rita Hayman, petitioner's trial counsel, explained that she considered calling Ms. Richardson as a witness but, after consultation with petitioner, see Hearing Transcript at 41, decided not to, for the following reasons: (1) Her investigator had reported to her that Ms. Richardson was an alcoholic, Hearing Transcript at 40; (2) Her statement to Detective Lockwood that she had seen someone running down the street with a beige plaid jacket and a black gun was more nearly descriptive of petitioner than of Perez, *id.;* (3) that statement was inconsistent with everyone else's account of the incident, including petitioner's, *id.;* (4) Ms. Richardson's longer handwritten statement was unreliable because of her vantage point and the lighting,

---

**6.** Because there had been no state court hearing at which petitioner could have had a full and fair opportunity to develop all the facts relevant to his claim of ineffective representation, this court allowed exploration, in the evidentiary hearing, of other aspects of counsel's performance. See Transcript of Hearing, *Sanders v. Sullivan*, 85 Civ. 4014 (S.D.N.Y. June 19, 1987) [hereinafter Hearing Transcript], at 28–34.

**7.** Petitioner's attack on counsel's failure to call Ms. Richardson is set in the context of a broader attack on counsel's alleged ineffectiveness for failure to conduct a proper investigation. Petitioner's Proposed Findings and Conclusions at 13–20. If counsel's decision not to call Ms. Richardson was proper, a fortiori the claim of failure to investigate fails, at least on that ground.

*id.* at 41; (5) Ms. Richardson was under indictment for murder, *id.*, although Ms. Hayman did not research whether the indictment would have been admissible if Ms. Richardson had been called, *id.* at 46. Ms. Hayman admitted that it would have been reasonable to infer from Ms. Richardson's handwritten two-page statement that she had seen Perez running from the building. *Id.* at 45. Nonetheless, from the totality of information available to her, Ms. Hayman concluded that Ms. Richardson would not provide credible exculpatory evidence for petitioner:

> A: It was my opinion and I recall it, now that I reread it more carefully, that this woman was lying, based on all of the other testimony that I had heard from Carmelo Perez, from the police officers, from Irma Semiday, although I didn't think she was too reliable, and what Mr. Sanders had told me. I felt that she was lying and that she had become involved to be part of this case for whatever reason, as some people want to be, and I didn't trust what she was saying. And I frankly, in light of all the other testimony and my client's explanations to me, repeated explanations to me, felt that there would be no purpose to be served in calling her.
>
> Q: Or in interviewing her?
>
> A: Correct. Or in interviewing her.

*Id.* at 46.

This court cannot say that the decision not to call Ms. Richardson was so unreasonable as to deprive petitioner of effective assistance of counsel. To raise a reasonable doubt about petitioner's guilt in the minds of the jury, Ms. Richardson's statements would have to be believed, and believed to be *about* Perez. Even if they are believed, if read in abstraction they are entirely unrelated to Sabir's shooting. They describe someone out on the street, who may or may not have been inside the building where Sabir was shot, chasing three people who do not figure in anybody else's account of Sabir's death.[8] Moreover, on all the evidence before her it was reasonable for Ms. Hayman to conclude that if reasonable jurors were to regard Ms. Richardson's statements as relevant, they would take them to be about petitioner. For it was petitioner, not Perez, who by other accounts was wearing a plaid or checked garment that night.

Petitioner's final word on this matter appears in his Reply to Respondents' Proposed Findings of Fact and Conclusions of Law:

> Ms. Hayman never knew precisely what Richardson had said to the police on the night of the incident or what her testimony would have been because neither Ms. Hayman nor her investigator ever spoke to Richardson about her observations.... Therefore, virtually *all* of Ms. Hayman's purported reasons for not calling Ella Mae Richardson as a defense witness—Richardson's description of the jacket worn by Perez as well as her weak credibility and her alcoholism—were conjectural. Credibility simply cannot be assessed *in absentia.*

*Id.* at 5 (citation omitted).[9] Petitioner's claim is simply false. Credibility can per-

---

8. This court observes at least one matter on the face of Ms. Richardson's handwritten statement that the parties have not raised but that casts doubt on her credibility. Although Perez lived at 70 East 119th Street, see Transcript at 67, 68, 74, and there is no dispute that the incident happened there, Ms. Richardson twice says that she was watching *76* East 119th Street. Evidently Ms. Richardson wrote the wrong number for the right address: for evidently she somehow managed to make her way to 70 East 119th Street, and the notes, apparently by Detective Lockwood, of a conversation with her refer to the correct address. Her writing down the wrong address, however, is certainly internal evidence that she was confused, drunk, or otherwise an insufficiently reliable observer to be credited. If she cannot be believed on that detail, as she clearly cannot, she becomes less believable on others.

9. It is important to note that petitioner's counsel here states as fact something that is mere conjecture on petitioner's part—that it was *Perez* Ms. Richardson purportedly saw rather than petitioner. Petitioner's moving papers do not contradict the claim that petitioner was wearing a checked or plaid garment of the sort Ms. Richardson described, nor does petitioner even try to tell a story about how Perez might have wrested petitioner's jacket from him, put it on, run out into the street, and returned, all in the two or three minutes before the police arrived on the scene.

fectly well be assessed "in absentia." An appellate court will not second-guess a trial court's judgments as to credibility, but that is because the trial court has actually seen the witness and therefore had an opportunity to judge demeanor. Often, witnesses are unavailable and the court must assess the credibility of their prior statements, such as depositions. In this case, this court has already pointed to a factor that diminishes Ms. Richardson's credibility.

More importantly, Ms. Hayman could have concluded that calling Ms. Richardson would hurt rather than help the defense case without making any judgment as to her credibility. Either Ms. Richardson was credible or she was not. If she was not credible, calling her could not have helped the defense. However, if she was credible, her story would have hurt the defense, because it placed a person with a plaid jacket on the street with a gun, at a time when the defense maintained that petitioner was wearing a plaid jacket but was still in the hallway, and was unarmed.

This court holds that the decision not to call Ms. Richardson was within the limits of a reasonable trial strategy and did not deprive petitioner of effective assistance of counsel.

## IV. *The Recantation of Carmelo Perez*

■ Finally, petitioner produces a document purporting to be a recantation by the State's principal witness, Carmelo Perez, of his testimony at trial. According to this recantation, Perez perjured himself at trial in order to protect Irma Semiday, the real killer of Sabir, but he has now, without coercion, had a change of heart. At the June 19, 1987 evidentiary hearing Perez gave an account of the robbery that essentially accorded with the recantation. Hearing Transcript at 82–83. When his testimony at trial about petitioner's having shot Sabir was read to him, he denied it. *Id.* at 84–85.

The purported recantation, as became clear at the hearing, goes only to the charge that petitioner shot Omar Sabir, not to the charges of robbery or weapons possession. Hearing Transcript at 92, 96. On these issues Perez stood by his trial testimony. His testimony at the hearing differed only in that he maintained that Irma Semiday rather than petitioner shot Sabir. Thus, at best the recantation could exonerate petitioner on only one of the charges against him.

This court holds that the recantation does not offer petitioner even that benefit. In general, "recantations of testimony given at trial are ' "looked upon with the utmost suspicion." ' " *United States ex rel. Rice v. Vincent,* 491 F.2d 1326, 1332 (2d Cir.) (quoting *United States v. Troche,* 213 F.2d 401, 403 (2d Cir.1954) (quoting *Harrison v. United States,* 7 F.2d 259, 262 (2d Cir.1925))), *cert. denied,* 419 U.S. 880, 95 S.Ct. 144, 42 L.Ed.2d 120 (1974). In addition, a habeas petitioner seeking relief on the ground of a recantation of allegedly perjured testimony must show that "the prosecutor or other government officer knew the testimony in question was false." *Thompson v. Garrison,* 516 F.2d 986, 988 (4th Cir.), *cert. denied,* 423 U.S. 933, 96 S.Ct. 287, 46 L.Ed.2d 263 (1975). *See Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct. 763, 765, 31 L.Ed.2d 104 (1972) (knowing prosecutorial use of false testimony is "incompatible with 'rudimentary demands of justice' " (quoting *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935))); *Perkins v. LeFevre,* 642 F.2d 37, 40 (2d Cir.1981) (same, citing cases); *United States ex rel. Burnett v. People,* 619 F.2d 668 (7th Cir.) (" '[T]he introduction of perjured testimony without more does not violate the constitutional rights of the accused. It is the *knowing* and *intentional* use of such testimony by the prosecuting authorities that is a denial of due process of law.' ") (emphasis supplied by court) (quoting *United States ex rel. Williams v. Walker,* 535 F.2d 383, 386–87 & n. 3 (7th Cir.1976) (quoting *United States v. Jakalaski,* 237 F.2d 503, 504–05 (7th Cir.1956), *cert. denied,* 353 U.S. 939, 77 S.Ct. 817, 1 L.Ed.2d 761 (1957))), *cert. denied sub nom. Burnett v. Illinois,* 449 U.S. 880, 101 S.Ct. 229, 66 L.Ed.2d 104 (1980).

Even if this court were to view Perez's supposed recantation with less than the utmost suspicion, the fact remains that nowhere in the record is there any evidence that the prosecution knew of Perez's alleged perjury. The affidavit of recantation itself contains no indication that Perez ever informed the prosecutors of his alleged perjury, and at the June 19, 1987 hearing Perez specifically denied ever informing the prosecutors:

Q: Your testimony today is that Mr. Sanders did not shoot Mr. Thomas, is that correct?

A: That is correct.

Q: But your testimony at trial was that he did shoot Mr. Thomas, is that correct?

A: That is correct, yes.

Q: So you are now taking back or recanting your testimony?

A: Correct.

Q: Did you ever tell an Assistant District Attorney that you changed your mind about your testimony?

A: No.

Q: *At any time?*

A: No.

Q: Did you ever tell any prosecutor in the prosecutor's office?

A: No.

Hearing Transcript at 93 (emphasis added). Petitioner did not contradict Perez's denial at the hearing, and fails to come forth with any other evidence that the prosecution knew that Perez's trial testimony was false. Under these circumstances, petitioner cannot prevail on this claim.

CONCLUSION

For all the foregoing reasons, Walter Sanders' petition for a writ of habeas corpus is DENIED.