**Walter SANDERS, Petitioner–Appellee,**

v.

**James E. SULLIVAN and Robert Abrams, The Attorney General of the State of New York, Respondents–Appellants.**

**No. 747, Docket 89–2383.**

United States Court of Appeals, Second Circuit.

Argued Feb. 8, 1990.

Decided April 16, 1990.

Alan J. Brudner, New York City (Henry Putzel III, New York City, of counsel), for petitioner-appellee.

Robert M. Raciti, Asst. Dist. Atty., New York City (Robert M. Morgenthau, Dist. Atty., New York County, Marc Frazier Scholl, Asst. Dist. Atty., of counsel), for respondents-appellants.

Before LUMBARD, NEWMAN and ALTIMARI, Circuit Judges.

LUMBARD, Circuit Judge:

The State of New York appeals the order of the District Court for the Southern District of New York, Constance Baker Motley, *Judge*, granting the petition of Walter Sanders for a writ of habeas corpus. Having traveled a lengthy procedural route, Sanders's habeas petition comes before us again following our remand. *See Sanders v. Sullivan*, 863 F.2d 218 (2d Cir.1988) (*Sanders I*).

After a 1982 jury trial in New York County, Sanders was sentenced to concurrent terms of five to fifteen years' imprisonment for his conviction of second degree manslaughter, first and second degree robbery, and second degree criminal possession of a weapon. He was also convicted of third degree criminal possession of a weapon and sentenced to a term of two and one-third to seven years' imprisonment, to be served concurrently with the other sentences. His direct appeal was unsuccessful, as was his 1984 petition in state court for a writ of *coram nobis*, alleging, in part, the recantation of one of the principal trial witnesses. Sanders was released on parole on August 3, 1988.

On May 28, 1985, Sanders filed a petition for a writ of habeas corpus in the Southern District on the basis, *inter alia*, of allegedly recanted testimony. After hearing the testimony of Carmelo Perez, the recanting witness, the district court on January 8, 1988 denied the petition, rejecting the claim that the prosecution had deliberately presented false testimony at Sanders's trial. *See* 701 F.Supp. 1000 (S.D.N.Y.1988). Later, on April 29, Judge Motley granted a certificate of probable cause to appeal under Fed.R.App.P. 22(b). *See* 701 F.Supp. 1008 (S.D.N.Y.1988). We affirmed in part, reversed in part, and remanded for further proceedings, rejecting Judge Motley's view that use of perjured testimony violates the due process clause only if the prosecution knew or should have known that the testimony was perjured; we held, instead, that the clause is violated "when a credible recantation of the testimony in question would most likely change the outcome of the trial and a state leaves the conviction in

place." 863 F.2d at 222 (footnote omitted). We remanded "for determination of the credibility of [the witness's] recantation," *id.* at 227, with the instruction that the petition should be granted only if the perjured testimony was "of an extraordinary nature," leaving the court with "a firm belief that but for ... [it], the defendant would most likely not have been convicted," *id.* at 226.

Perez died before being able to testify in the district court after remand. The parties then submitted briefs on two issues: whether the recantation from the first habeas hearing was credible; and, if the testimony was credible, whether Sanders probably would not have been convicted but for the perjury. The court held that the recantation was credible and that knowledge of the perjury, which concerned a material aspect of the State's case against Sanders, would have created a reasonable doubt and thereby have altered the jury's verdict. The court granted Sanders's petition as to all counts of conviction. We affirm the grant of the writ as to the conviction on the manslaughter charge and reverse as to the convictions on the other charges.

## I.

The State and Sanders take different views of the evidence at trial and of the effect of the recantation:

### The State's View

On October 14, 1980, between 8 and 8:30 p.m., Carmelo Perez returned to his Manhattan apartment after concluding several cocaine transactions and was accosted by two gunmen, later identified as Sanders and Bruce Thomas, a/k/a Omar Sabir. In the course of the robbery, Sanders and Sabir unsuccessfully attempted to handcuff Perez to a railing in the building's front hallway. Suddenly, Perez's common law wife, Irma Semiday, opened her apartment door to investigate the ruckus. After being told to shut the door, Semiday opened the door a second time, whereupon Sabir fired a shot at her that missed. Sanders then fired a shot toward the apartment door but the bullet struck Sabir. Sanders fled, but fired another shot in the direction

of the apartment when Perez went to the door and asked Semiday to let him in. Sabir later died from the gunshot wound.

Aleah Calhoun, a friend of Sabir, testified that at about 11 p.m. that night, Sanders telephoned her and said that he and Sabir completed the "stick up" but that Sabir had been shot. He repeatedly said that he did not kill Sabir and that he wanted to avenge the death.

### Sanders's View

Sanders, who testified at trial and at the first habeas hearing, told the following story. After agreeing to buy cocaine from Perez for a friend named "Eric," Sanders approached Sabir, asking Sabir to accompany him to meet Perez and to bring a gun. Sanders, Sabir and Perez met near Perez's apartment building, then entered the building and stood by the staircase. During the transaction, an apartment door opened. As Sabir walked toward the door, two shots were fired; although Sanders could not see Sabir because of a partition, Sabir soon stumbled back toward him, wounded, with his pistol in his hand and, according to Sanders's testimony, said, "She shot me." While Sanders and Perez tried to move Sabir's body, more shots were fired. Perez yelled at someone to get back in the apartment, and Sanders later saw a woman in the hallway.

At about 11 p.m., Sanders telephoned Calhoun, stating that during the drug transaction Perez's wife had shot Sabir.

### Perez's Testimony—Original and Recanted

At Sanders's trial, Perez testified for the prosecution, providing an account of how Sanders and Sabir robbed and beat him, attempted to handcuff him to a railing, and fired shots at Semiday. He also stated that Sanders fired the shot that hit Sabir.

In pertinent part, Perez's trial testimony was as follows:

Q: Mr. Perez, could you tell us please ... what, if anything, happened as you arrived at your front door?

＊　　＊　　＊　　＊　　＊　　＊

A: I was no more than two feet inside and I hear footsteps.... People running behind me. I turned around and I was confronted by these two guys and they got guns.

\* \* \* \* \* \*

Q: What did Mr. Sanders say specifically, if you recall?

A: "Hold it" [indicating with his hand as though he had a gun].

\* \* \* \* \* \*

Q: Did Mr. Sanders have a gun in his hands?

A: Yes.

\* \* \* \* \* \*

As soon as I walked down [the hallway], they ... grabbed me and Mr. Sanders put handcuffs, handcuffed me by my left hand.

\* \* \* \* \* \*

Mr. Sanders was trying to tie me to the radiator, but there was no radiator, so he put me against the rail, told me to put my hands up.

\* \* \* \* \* \*

Q: What happened next, if anything?

A: The other guy ... took my wallet out and he took the cocaine.

\* \* \* \* \* \*

Mr. Sanders took $180 from my other side.

\* \* \* \* \* \*

[H]e took that and he took my wristwatch.

In his 1985 habeas petition, however, Sanders attached an affidavit from Perez in which Perez stated that he had perjured himself at trial by testifying that Sanders had shot Sabir. In the hearing on the petition before Judge Motley, Perez swore to the following: In April 1984, while Perez was imprisoned at Ossining Correctional Facility, he encountered Sanders in a "chow line." Perez told Sanders that he knew Semiday had shot Sabir but that he had lied at trial to protect her. Because Semiday had recently died, Perez said, he no longer had a reason to conceal the truth.

At the same time, Perez reaffirmed his story that he had been robbed by Sanders and Sabir.

Appearing before Judge Motley in the first hearing on Sanders's habeas petition, Perez testified as follows:

Q: At some point after you went shopping for groceries did you encounter Walter Sanders and Bruce Thomas or Omar Sabir?

\* \* \* \* \* \*

A: As I was coming into the building I heard some people running behind me. I turned around and I was confronted by Mr. Sanders and Thomas.

\* \* \* \* \* \*

They held the gun to my chest and they pushed me inside the building.... Mr. Sanders put a handcuff on me, handcuffed me to the rail of the stairs.... [A]fter that they took everything I had, the wallet, the money, the coke and the wristwatch.

After being reminded of his trial testimony regarding the shooting of Sabir, Perez testified:

Q: You are now stating that the testimony that you gave at Mr. Sanders' trial was not true?

A: Not the part about—the first part was true. The second—he didn't kill his partner.

Q: You mean the first part relating to the robbery and the second part relating to the homicide?

A: Yes.

\* \* \* \* \* \*

Q: Why did you not tell the truth at the trial of Mr. Sanders?

A: Why? Because ... it was between him and my wife and I wasn't going ... to let her go to jail.... This guy came to rob me and she was protecting me....

On cross-examination, Perez testified:

Q: They tried to rob you, is that correct?

A: They not only tried, they robbed me.

Q: What did they take?

A: They took $1300 all together, coke and a wristwatch.

Perez died before being able to testify before Judge Motley on remand.

## II.

### A. *The Effect of* Sanders I

The State argues that the 1988 holding in *Sanders I*—that habeas relief can be granted based on the use of perjured testimony at trial even though the prosecution had no knowledge of its falsity—is at odds with clear Supreme Court precedent and with the holdings of other circuits. It urges us to hold that only knowing prosecutorial use of perjured testimony constitutes sufficient state action to trigger a violation of a defendant's right to a fair trial. Sanders argues, in contrast, that *Sanders I* is the law of the case and should not be disturbed.

■ Under the law of the case doctrine, this court adheres "to its own decision at an earlier stage of the litigation" unless there are "cogent" or "compelling" reasons not to, such as "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Doe v. New York City Dept. of Social Services*, 709 F.2d 782, 789 (2d Cir.), *cert. denied sub nom. Catholic Home Bureau v. Doe*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983) (citations omitted).

■ We see no reason to abandon our holding in *Sanders I*. We are not persuaded by the State's citation of Supreme Court cases from the 1930s and 1940s. *E.g., Hysler v. Florida*, 315 U.S. 411, 62 S.Ct. 688, 86 L.Ed. 932 (1942); *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). In *Sanders I*, we expressly addressed these cases and, further, recognized that our position was contrary to that of a number of other circuits: "We are mindful that the rule in many jurisdictions supports Judge Motley," who held that "perjured testimony, without more, does not rise to the level of a constitutional defect." 863 F.2d at 222 & n. 2 (citing

cases from the Third, Fifth, Sixth, Seventh, Ninth, Tenth, and Eleventh circuits).

■ Alternatively, the State urges us not to apply *Sanders I* on the ground that it announced a "new rule" of criminal procedure, the benefit of which Sanders should be denied under recent Supreme Court decisions. *See Teague v. Lane*, —— U.S. ——, 109 S.Ct. 1060, 1069–78, 103 L.Ed.2d 334 (1989) (plurality opinion of O'Connor, J.); *Saffle v. Parks*, —— U.S. ——, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990); *Butler v. McKellar*, —— U.S. ——, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990). Tracking the language of *Teague*, the State asserts that *Sanders I* altered "the constitutional standards that prevailed at the time the original proceedings took place" with respect to convictions based in material part on perjured testimony, 109 S.Ct. at 1073 (quoting *Desist v. United States*, 394 U.S. 244, 262–63, 89 S.Ct. 1030, 1040–41, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting)). Without deciding whether *Sanders I* announced a "new rule," we reject the State's contention because we believe the *Teague* analysis is inapplicable here.

Holding that new rules will not be retroactively applied in cases on collateral review, the Court in *Teague* reasoned that the state's interest in the finality of its criminal judgments cautions against nullifying what state courts have done when, at the time of the proceedings, those courts were applying established rules of law. As the Court stated:

> Application of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect.

109 S.Ct. at 1074. Underscoring this concern was the Court's view, rooted in notions of comity, that state courts should not be forced to "anticipate, and so comply with," changes in federal constitutional law of which they could not have known at the time of a petitioner's trial and direct appeals. *Id.* at 1075 (quoting *Brown v. Allen*, 344 U.S. 443, 534, 73 S.Ct. 397, 424, 97

L.Ed. 469 (1953) (Jackson, J., concurring)). These concerns of deterrence and comity, which persuaded the Court to fashion its restrictive approach to retroactivity, speak directly to the state's conduct of the criminal trial and appeal. "[T]he threat of habeas serves as a necessary incentive for trial and appellate judges throughout the land to conduct their proceedings in a manner consistent with established constitutional principles." *Teague,* 109 S.Ct. at 1073 (quoting *Desist,* 394 U.S. at 262–63, 89 S.Ct. at 1041 (Harlan, J., dissenting)). Additionally, the Court worried about state courts' having "to marshall resources in order to keep in prison defendants whose *trials and appeals* conformed to then-existing constitutional standards," *Teague,* 109 S.Ct. at 1075 (emphasis added).

The difficulty in determining whether a decision establishes a "new rule" further exemplifies that the Court's predominant concern was to allow states the freedom to conduct their criminal proceedings unfettered by retroactive federal court supervision. "[O]ur task is to determine whether a state court considering [a petitioner's] claim *at the time his conviction became final* would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution." *Saffle,* —— U.S. at ——, 110 S.Ct. at 1260 (emphasis added). The "new rule" inquiry effectively asks habeas courts to place themselves in the position of a state appellate court on direct review and, by so doing, discern whether the constitutional standards *then* prevailing would have provided the defendant any relief. Just as a state appellate court would affirm a conviction absent constitutional error, so too, under the *Teague* analysis, should a federal habeas court rule in examining the state court proceedings.

Thus construed, *Teague* does not come into play when the state's constitutional violation is the preservation of a conviction despite a credible recantation of material testimony. Because recantations typically

do not occur until after the trial and direct review are completed, the state's failure to reverse the conviction does not speak to the conduct of the state's criminal proceedings. A habeas petitioner alleging that a crucial trial witness perjured himself does not contend that the state conducted the trial illegally or otherwise acted in an unconstitutional fashion. Instead, he contends, as Sanders does here, that it is unlawful for the state to *continue* his custody in light of the recantation—a violation for which a writ of habeas corpus is the petitioner's central remedy.

In Sanders's case, the recanting witness did not come forward until about two years after conviction, long after the exhaustion of his avenues of direct appeal. This circumstance requires that Sanders obtain relief on collateral review. If he could not, his right to federal habeas relief against unlawful state custody would be emasculated. We do not believe the Court, in restricting the retroactive application of new rules of criminal procedure, intended in *Teague* and its progeny to effect such a result.

■ Even if the *Teague* analysis were thought to preclude the consideration of the recantation in this habeas proceeding, however, we would hold that the rule of *Sanders I* falls squarely within one of the exceptions to the retroactivity doctrine announced by the Supreme Court. That exception allows the retroactive application of "watershed rules of criminal procedure," *Teague,* 109 S.Ct. at 1075, that is, new rules that affect "fundamental fairness" or "the likelihood of obtaining an accurate conviction." *Id.* at 1077.[1] *Sanders I* speaks directly and precisely to the accuracy of a conviction: Simply stated, its rule is that the use of perjured testimony violates the due process clause when the court has "a firm belief that but for [that] testimony, the defendant would most likely not have been convicted." 863 F.2d at 226. In reaching this result, we reasoned:

---

**1.** The first exception, not relevant here, concerns rules that place "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to pro-

scribe," *Teague,* 109 S.Ct. at 1075, quoting *Mackey v. United States,* 401 U.S. 667, 692, 91 S.Ct. 1160, 1180, 28 L.Ed.2d 404 (1971) (Harlan, J., dissenting).

It has long been axiomatic that due process requires us "to observe that fundamental fairness essential to the very concept of justice." It is simply intolerable in our view that under no circumstance will due process be violated if a state allows an innocent person to remain incarcerated on the basis of lies.

*Id.* at 224, quoting *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941).

Few rules are more "central to an accurate determination of innocence or guilt," *Teague,* 109 S.Ct. at 1077, than the requirement, "implicit in the concept of ordered liberty," *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), quoted in *Teague,* 109 S.Ct. at 1075, that one should not be convicted on false testimony. Thus, we would abide by *Sanders I* even if it fashioned a new rule of criminal procedure.

## B. *The Manslaughter Conviction*

The State concedes that, given Judge Motley's crediting of Perez's recantation on remand, the manslaughter conviction—which was based almost exclusively on Perez's initial testimony that Sanders fired the shot that killed Sabir—cannot stand. We affirm the district court's grant of Sanders's petition with regard to the manslaughter conviction.

## C. *The Other Charges*

■ The State contests Judge Motley's conclusion that Perez's recantation affects Sanders's conviction on the robbery and weapon possession charges as well. Judge Motley recognized that Perez recanted his original version of the events only as it pertained to who fired the fatal shot, and she acknowledged that he maintained his earlier story that Sanders and Sabir, armed with guns, accosted him in the hallway and robbed him. Yet she held that the recanted version of events discredited Perez's trial testimony in its entirety: "The court finds that ... [if] Perez's testimony [had] been unmasked as perjured testimony, the jury could reasonably have discredited his testimony concerning the alleged robbery and weapon possession as well."

We disagree. By crediting Perez's recantation, the district court implicitly believed his reason for lying at trial: that he hoped to shield his wife from prosecution with regard to Sabir's death by blaming Sanders instead. There would have been no reason, however, for the jury to believe that Perez testified falsely about the robbery, and we find nothing in Perez's affidavit or testimony to suggest that he had any motive to be untruthful with respect to the other details of his account of the night's events. We believe the jury would have concluded that Perez's desire to shield his wife from a homicide charge in no way tainted his claim that he was the victim of an armed robbery. As Perez testified at the habeas hearing, in explaining his rationale for lying at trial to protect Semiday, "[Sanders] came to rob me and [Semiday] was protecting me."

We also agree with the State's contention that there was considerable evidence other than Perez's testimony to support the conviction on the robbery and weapons charges. First, the investigating police officer discovered Perez at the scene dazed and bleeding with handcuffs dangling from his left wrist—which confirmed Perez's testimony that he was robbed and handcuffed. Second, Sanders's fingerprint was found on a second pair of handcuffs—not those dangling from Perez's wrist—recovered from the scene. Third, Aleah Calhoun, the woman whom Sanders telephoned after Sabir was shot, testified that Sanders told her of the "stick up" during which Sabir carried a loaded gun and Sanders a toy gun. Given the accumulation of evidence pointing to the conclusion that Sanders and Sabir committed armed robbery, we are satisfied that the jury, in light of Perez's partial recantation and partial reaffirmation, would have believed beyond a reasonable doubt that Sanders was guilty of the robbery and weapons charges.

We thus do not have a "firm belief" that, but for the perjury, Sanders "would most likely not have been convicted" of the other charges. *Sanders I,* 863 F.2d at 226. On

the contrary, we are persuaded that the jury would have convicted Sanders of robbery and weapons possession even had it believed that Perez testified falsely that Sanders shot Sabir.

### III.

Accordingly, we affirm the grant of Sanders's petition as it pertains to the manslaughter charge but reverse the order as it pertains to the other charges.

Affirmed in part and reversed in part.