Michael HUGHES, Petitioner,

v.

William PHILLIPS Superintendent of Green Haven Correctional Facility Respondent.

No. 04 CV 2975 CM.

United States District Court, S.D. New York.

June 12, 2006.

---

Michael Hughes, 99–A–4172, Green Haven Correctional Facility, Stormville.

A.D.A. Joseph Sergi, A.D.A. Joseph M. Latino, Office of the District Attorney, Westchester County, White Plains.

### DECISION AND ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS

MCMAHON, District Judge.

This petition, filed pursuant to 28 U.S.C. § 2254, collaterally challenges a judgment rendered on November 18, 1998 in the County Court of Westchester County (Lange, J, sitting with a jury) convicting petitioner of the burglary in the first degree, robbery in the first degree, robbery in the second degree, unlawful imprisonment in the second degree, and grand larceny in the third degree. On March 3, 1999, petitioner was adjudicated a persistent violent felony offender and was accordingly sentenced to concurrent prison terms of 25 years to life each for the crimes of burglary in the first degree, robbery in the first degree and robbery in the second degree. He was sentenced to concurrent terms of one year for unlawful imprisonment in the second degree and 3½ to 7 years for grand larceny in the third degree.

On October 8, 2002 the Appellate Division unanimously affirmed the judgment of conviction. *People v. Hughes*, 298 A.D.2d 403, 751 N.Y.S.2d 379 (Exhibit F, R: 224).

On October 30, 2002, petitioner sought leave to appeal therefrom to the Court of Appeals. On June 18, 2002, petitioner moved in the trial court to vacate the judgment pursuant to NYCPL 440.10 claiming that his trial counsel was ineffective. (Exhibit G; R: 113–168). Judge Lange denied the motion in a decision and order entered October 25, 2002. (Exhibit G, R: 280–83). On December 26, 2002, the New York Court of Appeals (Ciparik, J.) issued its certificate denying leave to appeal. *People v. Hughes*, 99 N.Y.2d 559, 754 N.Y.S.2d 211, 784 N.E.2d 84 (Exhibit F, R: 225).

The instant petition seeks habeas relief on five separate grounds:

(1) THE STATE SUPPRESSED EXCULPATORY AND IMPEACHMENT EVIDENCE IN VIOLATION OF BRADY AND GIGLIO;

(2) THE INTRODUCTION OF EVIDENCE BY THE PROSECUTION THRU CROSS–EXAMINATION OF A DEFENSE WITNESS REGARDING THE EXISTENCE OF AN ILLEGAL WEAPON AT [PETITIONER'S] RESIDENCE WAS IMPROPER, PREJUDI-

CIAL AND CONSTITUTED RE-
VERSIBLE ERROR;

(3) PETITIONER WAS DENIED HIS
CONSTITUTIONAL RIGHT TO A
JURY OF HIS PEERS;

(4) PETITIONER'S GUILT WAS NOT
PROVEN BEYOND A REASONABLE
DOUBT; and

(5) PETITIONER WAS DENIED EF-
FECTIVE ASSISTANCE OF TRIAL
COUNSEL.

(Petition Attachment Sheet).

## I. *Background*

### A. Evidence at the Trial

In early January of 1998, Ian Tai pur-
chased a 2½ by 2 foot safe from Tremont
Locksmith for his home at 127 N. High
Street in Mount Vernon, a multifamily
house with three separate living areas.
(T: 472–73; 476–77PE: 34A–F).[1] Tai and
his family occupied the second and third
floors, accessible by entering the front
door and traveling up a flight of stairs, at
the top of which the entrance of his apart-
ment opened into its dining room. (T:
472–73; PE: 32, 34A–F). At this time,
the first floor was vacant and Tai's moth-
er-in-law occupied the basement apart-
ment. (T: 472–73).

Two employees of Tremont Locksmith,
Eddie Diaz and Jose Ortero, installed the
200 pound safe in the closet of Tai's bed-
room, located on the third floor of the
house. (T: 477–78). The bolts normally
used to secure the safe to the floor were
too short, so Tai told the installers that he
would obtain longer bolts at a later date.
(T: 478, 853–54). Soon afterwards, Tai
went on a previously scheduled trip to
Mexico and as a result, did not bolt the
safe down. (T: 522).

After installing the safe and returning to
Tremont Locksmith, Diaz and Ortero
talked to the other employees about the
large amount of cash that Ian Tai had in
his house, which they had seen when he
transferred it to the safe. (T: 856–57).
This discussion occurred in front of anoth-
er employee, Orlando Mendoza. (T: 859,
866). Mendoza contacted an acquaintance
of his, Gabriel Falcones, who had a history
of committing robberies and burglaries,
about breaking into the Tai house (T:
1095). Mendoza told Falcones and Vin-
cente Urbina, whom Falcones knew
through his work at a jewelry store, about
the large amounts of money in the house.
(T: 1096). Later, Falcones contacted peti-
tioner about breaking into the house. (T:
1096).

Mendoza gave his fellow conspirators
Tai's address, telling them that Tai was on
vacation and that nobody would be in the
house. (T: 1097). Four days later, using
a car belonging to Falcones' boss, Mendo-
za, Falcones and Urbina drove to Mount
Vernon, where they located and observed
Tai's house. (T: 1097). On January 26,
1998 and the early morning of January 27,
1998, Falcones spoke to petitioner and Ur-
bina to firm up the plans for the robbery.
(T: 1100; PE: 48A–I).

Telephone records reflected the follow-
ing calls on January 26, 1998: Falcones
called Urbina at 10:00 p.m. and again at
11:49 p.m. (PE: 48A–I); Falcones called
petitioner's beeper at 10:02 p.m. (PE:
48A–I); Urbina called Falcones at 8:35
p.m. and 11:07 p.m. (PE: 48A–I). The
records of petitioner's mother, Daisy
Hughes, and his fiancée, Lavonne Dunlop,
also reflected calls to Falcones at 10:05

---

**1.** Transcript references are as follows: "H"
for pre-trial hearings (pp.1–216) and "T" for
the trial. "PE" and "PEH" respectively des-
ignate People's exhibits in evidence at the
trial and at the hearing.

p.m. and 11:46 p.m. on that day. (PE: 48A–I).

On the next morning, January 27, 2000, those records reflected the following: Falcones called petitioner or his beeper four times between 7:06 a.m. and 8:23 a.m.; Falcones called Urbina at 7:09 a.m.; Urbina called Falcones twice between 7:00 a.m. and 8:00 a.m. (PE: 48A–I).

On that morning, January 27, 1998, petitioner and Urbina picked up Falcones in petitioner's white car and drove to Tai's house at 127 N. High Street in Mount Vernon. (T: 1101). Upon arriving, they saw a car parked in front of the house, indicating that someone was home, whereupon they went around the block to a gas station, where they unsuccessfully tried to contact Orlando Mendoza. (T: 1101, 1129–31, 1133).

In the meantime, around 11:00 a.m., Tai was home getting ready to go to work at several buildings that he owned, when his fifteen year-old daughter, Sherrica, returned home from school. (T: 479–80). In her sophomore year of high school at St. Catherine's Academy, she had taken a midterm exam that day and so was released early. (T: 480, 610). Ian Tai left for work at 12:00 p.m., leaving Sherrica in the house watching television and eating lunch. (T: 611).

Seeing Tai's car leave, petitioner and his accomplices made their move. (T: 1101). Moments after Tai left, petitioner rang the doorbell and Sherrica ran from the second floor living room down the stairs to the front door and looked through the peephole, but was unable to see who was standing there. (T: 611). Thinking that her father had returned for something, Sherrica opened the door to find petitioner, dressed in black baggy jeans, a short dark coat and black gloves, standing on the doorstep. (T: 611, 635, 660, 661–62, 674, 696).

Surprised that someone had answered the door, petitioner recovered enough to improvise, pretending to be a salesman and asking Sherrica if she wanted to buy any beauty supplies. (T: 612, 672). When Sherrica declined, petitioner pushed his way into the house while struggling to remove a silver gun from his pocket. (T: 612, 697). As he forced his way inside the house, Sherrica saw Vincente Urbina, also wearing black baggy jeans and gloves, coming across the porch from a side door leading to the first floor apartment. (T: 612–13, 635, 746, 757).

Petitioner commanded Sherrica to walk up to the apartment and followed her as she complied. (T: 613, 673). As they entered, he told her to sit at the dining room table, then told her to sit on the couch in the adjacent living room. (T: 614, 1102; PE: 32). Urbina then entered the apartment, followed soon after by Falcones, and petitioner directed his cohorts upstairs to the bedroom where the safe was located. (T: 614, 698, 747, 1102; PE: 32). Petitioner then told Sherrica to stand and turn around and he taped her hands together behind her back with duct tape he had brought, then had her sit on the sofa and similarly bound her ankles. (T: 615, 698).

As this occurred, Sherrica heard loud banging from upstairs and, assuming the safe was being removed, repeatedly asked petitioner why they were doing this (T: 615). While petitioner remained watching over her, Sherrica observed Urbina and Falcones pushing the safe down the hallway toward her and proceed down the front staircase. (T: 615–616, 632–634, 747, 1102).

After Urbina and Falcones had removed the safe, petitioner also left the house, leaving a bound Sherrica sitting on the sofa. (T: 616). She heard a car door

slam, waited a few seconds and hopped over to the living room window, which overlooked the street in front of the house, in time to see a white car, with petitioner driving, pulling away. (T: 616, 676, 677, 678, 701–02). Sherrica worked on her bonds, finally freeing her wrists, and called her mother at work. (T: 617, 634–35, 702). When that call was inadvertently disconnected, Sherrica called her father, who told her to call the police. (T: 617). Sherrica immediately called the police, who arrived while she was still on the phone with the authorities. (T: 618, 703).

Detective Robert Waters of the Mount Vernon Police Department responded with his partner, Detective Louisa, at around 12:42 p.m. (T: 930, 1026). He was advised by uniformed officers already on the scene that a burglary had occurred and that a young girl had been tied up. (T: 931). Entering the house, Waters met with Sherrica in the dining room and she gave him a description of the three perpetrators, adding that they had driven off in a small white car and that the driver was wearing a heavy black jacket. (T: 931, 936, 996, 1027, 1047). The duct tape used to bind Sherrica was recovered from the dining room table. (T: 992–93, 994). Ian Tai returned home and verified that the safe installed several weeks earlier was gone. (T: 932).

Proceeding upstairs, Detective Waters observed the closet door standing open and marks on the floor illustrating where the safe had been dragged out of the room in a path from the second floor apartment, down the stairs, and out the front door of the house. (T: 932, 999).

Police officers canvassed the neighborhood around the Tai home for witnesses, without success. (T: 1001). After speaking to Sherrica at her home, Detective

Waters transported her to Mount Vernon Police Department to view mug shots. (T: 934). No identification was made from the over one hundred photographs that Sherrica viewed at that time. (T: 935).

The following day, January 28, 1998, Detective Waters went to Tremont Locksmith to speak to its owner, Zvi Zohar, about his employees. (T: 936–37). Zohar advised that Orlando Mendoza had not reported to work that day. (T: 937). Waters spoke to the employees who had installed the safe and did not consider them suspects for committing the robbery. (T: 968–69).

On February 3, 1998, Detective Waters reported to the Mount Vernon Police Department for his 5 p.m. to 1 a.m. shift and was instructed by his Lieutenant to pick up Sherrica and Ian Tai and bring them down to the area of 7 West Burnside Avenue in the Bronx, as the police had received a tip from a confidential informant that the burglars would be in that general area. (T: 938–39, 1004–1005, 1008, 1045).[2] He and Police Officer Clark picked up the Tais and returned to headquarters to switch to an unmarked car, which Clark drove to Burnside Avenue; Waters sat in the front passenger seat, Sherrica in the back seat behind Clark, with Mr. Tai next to her. (T: 940).

Arriving at Burnside Avenue, a busy commercial area, around 5:25 p.m., Clark found a parking spot directly across that street from 7 West Burnside Avenue and parked the car (T: 940, 942). Remaining in the car, the officers asked Sherrica to look around to see if she recognized anyone. (T: 941). Some fifteen minutes later, petitioner walked out of the doorway at 7 West Burnside Avenue, with Urbina

2. The jewelry store in which Falcones worked, and which petitioner and Urbina frequented, was located within the barber shop located at that address (T: 1123).

and Falcones a few steps behind him. (T: 943–44, 1037, 1102).

Immediately upon seeing petitioner, Sherrica stated, "Oh my gosh, that's him, that's him." Repeatedly asked if she was sure, Sherrica stated that she was positive she identified petitioner and Urbina as men who were inside her home on January 27, 1998. (T: 645–46, 649).

The three men started across the street. They approached a maroon car parked behind the unmarked police vehicle. (T: 944, 947).

Detective Waters radioed for backup units. Because no units had arrived when the men neared the maroon car, he and Clark got out, guns drawn, identified themselves and approached the suspects. (T: 885–86, 901–902, 945, 1034–35). Petitioner was by then standing on the passenger side of the maroon car with the door open. Waters placed him against the car. (T: 945), as Clark did with Urbina and Falcones, holding them until the backup units arrived soon thereafter. (T: 886–887, 899, 923, 946–47, 1037).

Upon petitioner's arrest, $2,061 was recovered from his jacket pocket. (T: 889, 890, 914, 950). A Casio pocket organizer recovered from Falcones contained numbers for "Orlando" [Mendoza] and "Tiger" aka Michael Hughes. (T: 956, 1044, 1116–17, 1118; PE: 45, 46).

That evening, Falcones gave a videotaped confession, admitting his participation in the crime and detailing the participation of petitioner and Urbina. (T: 1128, 1146–48).[3] Later, officers went to Urbina's house, where his wife gave consent to a search that did not recover money or weapons (T: 917, 953). A search of Falcones' apartment was also negative for money, but two crowbars used to pry open the safe were found there. (T: 954, 1044, 1126; PE: 47).

The following day, on February 4, 1998, the police discovered petitioner's car parked in front of 20 West Burnside. (T: 958, 1010, 1011; PE: 40). At trial, Sherrica identified the car as the small white car she saw leaving the crime scene. (T: 642–643). It was searched pursuant to a warrant, and the police recovered petitioner's wallet and a pair of black gloves. (T: 959; PE: 41). Sherrica testified that the gloves match those worn by petitioner on January 27, 1998. (T: 641).

Petitioner put forth the defense that he had been working as a day porter in an office building in lower Manhattan, when the crime was committed. He also claimed that the money recovered from his coat pocket had been given to him by his future father-in-law to pay an IRS bill. (See T: 1267–1273, 1493–1494). He called several witnesses and testified on his own behalf. However, the only two witnesses who claimed to have actually seen petitioner downtown at the time of the crime (T: 1383–1385, 1388–1389, 1393, 1436–1440) were impeached by their earlier statements to the police, in which they had placed Hughes downtown at a time that allowed for petitioner's participation in the crime. (See T: 1418–1419, 1465–1467, 1470–1472). One of those witnesses was also contradicted by a rebuttal witness, a New York city fire inspector. (T: 1624–1627; PE: 54).

Urbina did not testify on his own behalf, but presented Cesar Tobar, who asserted that Urbina was doing laundry at a laundromat from 8:30a.m. to 2:30p.m., on the

---

3. Falcones testified at trial as a prosecution witness pursuant to a negotiated plea agreement (T: 1120–1121). In exchange for his cooperation and plea of guilty, Falcones received a sentence of imprisonment of eight years (T: 1121). The terms and conditions of the plea agreement were explored before the jury (T: 1120–1121).

day of the crime. (T: 1590). Tobar claimed that he knew that Urbina was there on that date because he had marked his calendar with a note stating that he had loaned Urbina $20. (T: 1591). On cross-examination the prosecutor elicited that Tobar had known Urbina for almost twenty years. (T: 1596). He also admitted that he had never shown anyone the calendar in question prior to the day before testifying (T: 1604), and that he had altered the calendar that morning when he crossed out a nickname written above Urbina's name (T: 1606–1607, 1611–1612). He also admitted, in the face of his assertions that he used the calendar to keep track of to whom he loaned money, that there were no other notations on it regarding such loans. (T: 1604–1605).

## B. *The Pre–Trial Hearings*

On April 21, 1998, petitioner made an omnibus motion seeking, *inter alia,* suppression of testimony concerning identification testimony, claiming suggestiveness of both an in-person identification of him and a confirmatory photographic identification procedure; By decision and order of May 14, 1998, the Westchester County Court ordered a *Wade* hearing.

Just prior to the *Wade* hearing, it was agreed that the hearing with respect to petitioner would be bifurcated, with Sherrica Tai not to testify unless and until the court determined that the identification was unduly suggestive and that an independent source hearing was needed. With respect to pretrial identification of code-

fendant Urbina, the People stated, "The witnesses who will testify at the trial for the People are not necessarily consistent with Detective Waters' testimony," and so agreed to an independent source hearing from the outset. (H: 2–3).[4]

Detective Waters gave the following testimony in regard to petitioner's identification.

On January 27, 1998, Mount Vernon Police Detective Robert Waters responded to a burglary/robbery at 127 North High Street in Mount Vernon. The victim, Sherrica Tai, lived there with her family. (H: 7–9).

On February 3, 1998, the police learned that the suspects might be in the area of 7 West Burnside Avenue in the Bronx (H: 9–11, 64, 130). Detective Waters picked up Sherrica and her father and took them to the location, on the chance that Sherrica might spot one or more of the suspects. After stopping at the Mount Vernon Police Department, Waters and Police Officer Joseph Clark drove the Tais to the stake-out area, arriving there about 5:30 p.m. (H: 10–13, 63–66). Waters parked their unmarked car across the street from 7 Burnside, at the corner of Jerome and Burnside Avenues, a main thoroughfare in a mostly commercial area. (H: 13–14, 67). The police did not know the names of the suspects and, other than the descriptions given by Sherrica, knew nothing about them (H: 12, 34, 38–39).

Within 15 minutes, Sherrica blurted out, "Oh my gosh, that is him, the black fel-

---

4. The only difference that prompted the People to consent to the independent source hearing with respect to Urbina was Sherrica's recollection that petitioner was in the company of three or four other people when she saw him at Burnside Avenue. (*See* H: 138–140). Waters' testimony was that petitioner was with just two others, Urbina and Falcones (H: 15–16), when Sherica saw him. This "dis-

crepancy" had nothing to do with her identification of petitioner, whom she pointed out to police first and foremost. (H: 104–105). On appeal, petitioner claimed that Sherrica had testified that "the police had *arrested* 4 or 5 men at the West Burnside location." (R: 124–25). However, that claim is not consistent with the record.

low," "That's the one that robbed me," and then, "And there's the two Spanish fellows right behind him" (H: 14–15). The three men she identified—petitioner, Urbina, and Falcones—walked across the lit street, toward the unmarked police car, getting within two or three feet of it. Waters radioed for back-up units and waited a few seconds. None responded immediately. Since the three suspects were about to get inside a car parked behind the police car, Waters and Clark decided not to wait for back-up, jumped out of their car, and apprehended the three men. (H: 15–16, 54, 70–72, 75). Waters, who was holding petitioner, apprised him of his *Miranda* rights. (H: 16, 19–20). Other officers, who had been delayed by the heavy traffic in this busy area, arrived and took petitioner and the other two men to police headquarters. (H: 17, 19).

Petitioner was taken to an interview room. With two other detectives present, Waters again advised petitioner of his *Miranda* rights (H: 19–20). Waters asked petitioner to empty his pockets, which he did, revealing that he was carrying $2,061 in cash. (H: 20–22, 53; PEH: 8).

Within ninety minutes of petitioner's arrest, Waters took Polaroid photographs of petitioner and the two other men and showed them to Sherrica Tai, so she could make reference to them while giving a statement. (H: 23, 51, 77–78; PEH: 9). Sherrica confirmed that the men depicted were the same three men she had just identified on Burnside Avenue. (H: 25).

Following Waters' testimony, and before the anticipated ruling as to whether there was threshold suggestiveness in the identification of petitioner, petitioner's counsel argued that he should be allowed to question not only Sherrica, but also several other police officers, to attempt to substantiate his claim of suggestiveness. (H: 87–91). The court denied that request, observing that counsel was merely "fishing" in the hope that he might "stumble on to something." (H: 90).

The court credited Waters' testimony, noting that the police did not even know the identity of the suspects when they took the victim to the "busy neighborhood" of Burnside Avenue, and that the victim "spontaneously" pointed out petitioner. (H: 92–93). The court further found that, although the subsequent procedure of showing the victim the individual photographs of the suspects whom she had just identified was "arguably suggestive in nature," that procedure was merely confirmatory and did not vitiate the non-suggestive nature of the original identification procedure in the street. (H: 93). Accordingly, the court ruled that the People had satisfied their burden of going forward, and that the victim did not have to be produced for hearing testimony. (H: 93).

The hearing continued with respect to the identification of codefendant Urbina, at which Sherrica Tai testified on the issue of independent source for that identification.[5]

Sherrica testified that she was at home in her family's apartment on January 27, 1997, when petitioner, Urbina, and Falcones broke in. (H: 100–101). She had come home for lunch after taking an exam at her high school. Her father left the house around noon. When, several moments later, the doorbell rang, Sherrica thought it was her father returning. She opened the front door and saw petitioner, who looked surprised that someone would answer the door. (H: 109–110). When petitioner asked if she wanted to buy beau-

---

5. Although Waters' testimony is the only evidence relevant to the hearing court's decision on petitioner's motion, the testimony of Sherrica Tai is also recounted, as petitioner's claim is based upon information that came to light during Sherrica's testimony.

ty supplies, Sherrica said "No," and tried to close the door. Petitioner pushed his way inside and pulled out a small silver gun (H: 110). He ordered her to turn around. Before she did, she saw a second man—Urbina—come inside (H: 110–111). Her conversation with petitioner had lasted about one minute. (H: 111–112).

As ordered by petitioner, Sherrica walked upstairs and sat down in the living room. Petitioner pointed down the hallway and upstairs, in explanation to Urbina and Falcones as to where they should go. Before Urbina and Falcones went upstairs to Sherrica's parents' bedroom, Falcones handed petitioner a roll of silver duct tape. (H: 113–117). Petitioner taped Sherrica's arms and legs and never left her alone. (H: 117–118).

Sherrica heard a lot of banging upstairs and surmised that the burglars were removing the safe that had recently been installed in her parents' bedroom. (H: 117–118). She then saw Urbina and Falcones drag the safe downstairs. (H: 119). She heard the three men leave. After several seconds, she looked outside and saw a small white car driving away, with petitioner behind the wheel. (H: 121, 152). After calling her mother and father, Sherrica called the police. (H: 123).

Later that night, Sherrica looked though a book of mug shots at the Mount Vernon Police Department. (H: 147–148).

About one week after the crime, on February 3, 1997, Detective Waters picked up Sherrica and her father. After stopping at the Mount Vernon Police Department, Waters and Officer Clark drove the Tais to Burnside Avenue in the Bronx. They asked Sherrica to look and see if she recognized anyone from the break-in. (H: 101–103, 129–130, 155–156). Although it was just getting dark, the street was lit. (H: 135). After about five minutes, Sherrica spotted petitioner, blurting out, "Oh

my gosh, that is him," and identifying the two men who were walking behind him as his accomplices. (H: 103–105, 136). When the detectives asked if she was positive, she said that she was. (H: 105). When Waters was unable to contact a back-up team, he and Clark got out and apprehended the three suspects. (H: 105–106, 137–138). Later, at the Mount Vernon Police Department, Sherrica was shown photographs of her assailants and confirmed her identification of them. (H: 107–108; PEH: 9).

Sherrica also testified that, some time during the next week after the crime, she went to a Bronx precinct and looked at more photographs of possible suspects. (H: 152–155).

Petitioner's counsel renewed his request to call further witnesses, arguing that Sherrica's testimony indicated that she had gone to a Bronx station house to look at photographs sometime prior to Burnside Avenue. Counsel argued that this impugned Detective Waters' testimony that he did not even know who he was looking for when the police took Sherrica to Burnside Avenue. (H: 163). The trial Assistant responded that he had never been told that Sherrica had viewed photographs at a Bronx police precinct, and he was "attempting to find out whether or not any detective in fact took her to the Bronx." However, he argued that even if it occurred, it did not impugn Waters' credible and dispositive testimony that he did not know the identity of the suspects before Sherrica spontaneously identified petitioner. (H: 165–168).

The court did not alter its earlier findings that Waters' testimony was credible and that the People had satisfied their burden of going forward. (H: 181).

The court found that petitioner did not satisfy his burden of showing by a prepon-

derance of the evidence that the procedures used were "constitutionally impermissible." (H: 181). Consequently, the court denied petitioner's motion to suppress identification testimony. (H: 182).

### C. Trial Proceedings Regarding the Viewing of "Photographs" in the Bronx

During the trial, prior to the testimony of Police Officer Joseph Clark on November 2, 1998, the prosecutor reported the following to the court and defense counsel. Sherrica and her father had confirmed that Sherrica had viewed photographs at the 48th precinct in the Bronx. They also told the prosecutor that Sherrica told the police that one of the many photographs she then viewed "looks like" one of the persons who robbed her home and had not made an identification of any of the perpetrators. (T: 541–542).

The prosecutor added that he had inquired of the Mount Vernon Police Department and found out "for the first time today" that two Mount Vernon Police Detectives—Daniel Fischer and Ronald Fatigate, but not Waters—had, indeed, taken the Sherrica to the 48th precinct to view photographs. (T: 542). Although Detective Waters was unaware of any reports generated by Detectives Fischer or Fatigate in regard to the trip to the Bronx, he was calling headquarters to ascertain whether any reports were made about that event. (T: 542–543).

Defense counsel argued that it was possible that Sherrica "was shown a photo and some measures were taken to make sure that she didn't blow the ID." He asked that the Wade hearing as to petitioner be re-opened so that he could, "See the book, see the photo, speak to the detective who supplied the book and the photo, speak to Detective Fischer." (T: 544–45).

The court suggested that defense counsel speak to Sherrica Tai before she took the stand, so as to gather concrete information to support his request to re-open petitioner's Wade hearing. (T: 547). However, counsel declined that invitation, stating that "To speak to a witness now out in the hallway kind of defeats the purpose of surprise of cross-examination." (T: 547–548).

The prosecutor then requested a brief recess, explaining that both Detective Fischer and Detective Fatigate were not due into work until 5:00 p.m. and the prosecutor intended to contact the Mount Vernon Police Department to arrange for the detectives to call him from their homes to give him an expedited, oral report on the event. (T: 550).

Following that brief recess, the prosecutor indicated that he was awaiting contact from Detectives Fisher and Fatigate and further reported that, as Detective Waters had not been able to locate any written report about Sherrica's visit to Headquarters, the prosecutor had contacted Mount Vernon Police Lieutenant Kelly to request any files or reports concerning the event. (T: 551).

Following the testimony of Police Officer Clark, the People produced the just received facsimile of a Mount Vernon Police Department report authored by Detective Fischer, which indicated that, on January 30, 1998, Detectives Fischer and Fatigate had taken Sherrica and her father to the 48th precinct in the Bronx, that Sherrica viewed photographs on that precinct's photo image computer, and that she "was unable to make a positive ID at this time." (T: 597–598).

The court suggested that the defense counsel should have the opportunity to question Detective Fischer prior to the testimony of Sherrica Tai. (T: 600). The prosecutor made Detective Fischer avail-

able for that purpose. (T: 600–601). Again, petitioner's counsel declined the court's offer, stating that "At this stage I prefer to speak to my witness under oath, since nobody wanted to speak to me before, that is the way they play it, I'll talk to them under oath." (T: 601). The prosecutor responded, "That is not the way I'm playing it," and again offered to make Fischer available during the lunch recess. (T: 601–602). Only counsel for the codefendant Urbina accepted that opportunity. (T: 602–603).

Following the luncheon recess, counsel for codefendant Urbina reported that he had spoken to Detective Fischer and Fischer said he had not been present during the entire time that Sherrica was viewing the computer photo images. (T: 604). Counsel for the co-defendant speculated that a New York City police detective would also have been present when Sherrica viewed the photo images and argued that Fischer was "obliged" to know that detective's name. (T: 605–606). Counsel for Urbina also observed that of all the discovery material turned over during the case to the defense, Fischer's report was the only one that was unsigned; petitioner's counsel joined in that observation. (T: 606–607). The prosecutor responded that Lieutenant Kelly had not been able to locate Fischer's original, signed report, but that the police department's computer records did indicate that the subject report was generated on January 31, 1998. (T: 607).

At the conclusion of the Sherrica's direct testimony, petitioner's counsel asked to see the computer image that Sherrica viewed at the 48th precinct, "To see if that photo is on traditional type of displays as in like a photo book where you would have three or four pictures on the same page" and sought a continuance for that purpose. He said he would "Like to hear what if any

information was discussed, when she made that statement" and "Would like the chance to find out who this detective is who is with her, and if there wasn't a follow-up, why wasn't there a follow-up." (T: 650–651).

The prosecutor opposed that application, reminding the court that petitioner's counsel had been given the opportunity to ask those questions of Sherrica prior to her testimony and that Sherrica never made a positive identification from the photo images at the 48th precinct. The ADA pointed out that it was not necessarily true that a detective was present throughout the time Sherrica viewed the photo images at the Bronx precinct. (T: 651–652). When the People assured the Court that Sherrica would be recalled for further testimony if necessary, the court denied counsel's request for a continuance. (T: 652–653).

Petitioner's attorney began his cross-examination of Sherrica. (T:655). He did not ask her about her viewing of photo images at the 48th precinct, or whether she had ever seen any photo image of petitioner prior to identifying him on the street or whether anything influenced that identification. (*See* T: 655–691).

Following cross-examination of Sherrica by petitioner's attorney, the prosecutor reported that he had asked to locate a signed copy of Fischer's report, but none had been found. (T: 693–694). The sole response was by counsel for Urbina, who reiterated his observation that Fischer's report was the only unsigned document turned over to the defense. However, he stated that he was ready to begin his cross-examination of Sherrica. (T: 694). Asked if he was also ready to proceed, counsel for petitioner simply said, "Same argument." (T: 694).

During his cross-examination of Sherrica, counsel for the codefendant did elicit that Sherrica had looked at photographs at

the Bronx precinct, that she pointed out someone who looked like one of the robbers and that she "wanted to get a better look at" the image. (T: 711–712). Sherrica did not remember to whom she said this. (T: 713, 822).

On re-direct examination by the People, Sherrica testified that when she was at the Bronx precinct, she never saw any photographs depicting *any* of the people involved in this crime and that she had said only that she "wanted to get a better picture" one of the persons she viewed. (T: 750, 822). Sherrica further testified that no one "*ever*" did or said anything to suggest that she identify a particular individual. (T: 822).

Immediately following Sherrica's testimony, the court received a note from the jury asking if the person Sherrica had "wished to see more of" when looking at the photo images in the Bronx was, in fact, the petitioner. (T: 833). All agreed that they and Sherrica did not know the answer to that question, so that Sherrica would not be recalled to have that question put to her. (T: 833–834).

During continued colloquy in that regard (T: 834–35), petitioner's attorney commented that the photograph in question "clearly wasn't" that of petitioner, but said nothing more and did not request any relief. The court suggested, "Can we stipulate?" (ostensibly that the photograph she wanted to view more clearly was *not* petitioner). The prosecutor proposed that, as it had been agreed that it was "not going to come up with this witness," that possibility could be discussed later. (T: 834–835). In continued colloquy on the matter on the following day, petitioner's attorney stated, "I think based on everything that has been stated, there has been no indication that the photo she [Sherrica] saw was Michael Hughes." (T: 839).

Petitioner's attorney said nothing more, either at that time or thereafter during the trial.

Petitioner did not ask to recall the victim, despite that the opportunity to do so had expressly been left open for him (*supra*).

## II. *Standard of Review*

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal Court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir.2001) (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir.1999)).

A state court decision can involve an unreasonable application of Supreme Court precedent in two ways. *See Williams v. Taylor*, 529 U.S. 362, 407, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). First, a state court decision is unreasonable if the court identifies the correct governing legal rule but unreasonably applies it to the facts of the case. Second, it is unreasonable if a state court either unreasonably extends a legal principle from Supreme Court jurisprudence to a new context where it should not apply, or unreasonably refuses to extend the principle where it should apply. *Id.*

It is not enough that the state court reach an "incorrect or erroneous" decision. *Id.* at 410, 120 S.Ct. 1495. Rather, the state court's determination must be "objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495. In *Williams,* the Court stated that "the most important point is that an unreasonable application of federal law is different than an incorrect application of federal law," *Williams,* 529 U.S. at 410, 120 S.Ct. 1495, and since *Williams,* the Supreme Court has repeatedly recognized that there is a difference between "incorrect" and "unreasonable" applications of federal law. *See, e.g., Lockyer v. Andrade,* 538 U.S. 63, 123 S.Ct. 1166, 1174–75, 155 L.Ed.2d 144 (2003) ("In order for a federal court to find a state court's application of our precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous."); *Price v. Vincent,* 538 U.S. 634, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003) ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied a [Supreme Court case] incorrectly...."); *Woodford v. Visciotti,* 537 U.S. 19, 25–26, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (reversing Ninth Circuit judgment granting habeas relief on the ground that the Ninth Circuit "ultimately substituted its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d)"); *see also Eze v. Senkowski,* 321 F.3d 110, 124 (2d Cir.2003) (noting that habeas petitioner "must do more than show that he would have [prevailed] if his claim were being analyzed in the first instance....").

In *Andrade,* the Supreme Court rejected the Ninth Circuit's interpretation of "objectively unreasonable" as requiring no more than "clear error." *Andrade,* 123 S.Ct. at 1175. The Court stated that, "The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonable-

ness. It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." *Id.* (citations omitted). The standard to be applied "falls somewhere between merely erroneous and unreasonable to all reasonable jurists." *Wade v. Mantello,* 333 F.3d 51, 57 (2d Cir.2003) (quoting *Jones v. Stinson,* 229 F.3d 112, 119 (2d Cir.2000)). However, the "increment [of incorrectness beyond error] need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Eze v. Senkowski,* 321 F.3d 110, 125 (2d Cir.2003) (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)).

■ The exhaustion requirement of the AEDPA requires the petitioner to have presented to the state court "both the factual and legal premises of the claim he asserts in federal court." *Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir. 1982) (en banc); *See* 28 U.S.C. § 2254(b)(1)(A). For instance, if a petitioner specifies only certain issues that he deems worthy of review in a letter seeking leave to appeal a conviction to the New York Court of Appeals, he will be deemed to have waived any remaining claims in the original appellate brief. *Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991). However, a claim may be presented for habeas review even if the federal grounds were not explicitly asserted before the state courts if petitioner, in asserting his claim before the state court, (1) relied on pertinent federal cases employing constitutional analysis; (2) relied on state cases employing constitutional analysis in like fact situations; (3) asserted his claims in terms so particular as to call to mind specific rights protected by the constitution; or (4) alleged a pattern of facts well within the mainstream of

constitutional litigation. See *Daye v. Attorney General*, 696 F.2d at 194.

If a state prisoner has not exhausted his state remedies with respect to a claim and he no longer has a state forum in which to raise the claim, the claim may be deemed exhausted but procedurally barred. *Bossett v. Walker*, 41 F.3d 825, 828–29 (2D Cir.1994). In such a case, the federal habeas court may not review the state prisoner's federal claim, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)

With that in mind, I turn to Hughes' claims.

### Petitioner's Claims

Petitioner seeks habeas relief on five separate grounds: (1) the state suppressed evidence in violation of Brady and Giglio; (2) the introduction of certain evidence was reversible error, (3) petitioner was denied his constitutional right to a jury trial; (4) his guilt was not proven beyond a reasonable doubt; and (5) he was denied effective assistance of counsel. (Petition Attachment Sheet).

### I. *Brady Claim*

The first ground in Hughes petition states: "THE STATE SUPPRESSED EXCULPATORY AND IMPEACHMENT EVIDENCE IN VIOLATION OF BRADY AND GIGLIO." (Petition Attachment Sheet). Petitioner contends that the prosecution suppressed *Brady* material by failing to disclose in time for effective use at trial(1) the facts surrounding Sherrica Tai's viewing of photographs at the 48th precinct in the Bronx, on January 30, 1998,

and (2) the photograph that she identified as "one that could be the perpetrator." Petitioner further contends that he is entitled to discovery and an evidentiary hearing in support of his claim. (Pet. Traverse at 2).

### A. *Exhaustion*

The specter of *Brady* permeated the discussion, in the trial court, about how to proceed in light of the revelation that Sherrica had looked at photos at the 48th precinct. The trial judge even stated that the circumstances surrounding the 48th precinct viewing were "probably *Brady* material." (T. 548). Petitioner pursued his *Brady* claim in the first point in his brief on appeal to the Appellate Division, Second Department:

"THE TRIAL COURT'S REFUSAL TO RE–OPEN A WADE HEARING, COMPEL PRODUCTION OF THE PHOTOGRAPH OR GIVE AN ADVERSE INFERENCE CHARGE ON LEARNING THAT THE PEOPLE HAD POSSIBLY IDENTIFIED AN INDIVIDUAL OTHER THAN APPELLANT DEPRIVED APPELLANT OF A FAIR TRIAL, U.S. CONSTITUTION, AMENDMENTS VI, XIV"

(R: 154). Under this heading, petitioner argued that the Government suppressed exculpatory material and that the trial court failed to fashion an appropriate remedy or sanction for the violation of *Brady*. The Appellate Division rejected this and petitioner's other arguments in a concise decision, typical of that court:

Contrary to the defendant's contention, the County Court providently exercised its discretion in declining to reopen the *Wade* hearing (*see United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; *People v. Robinson*, 280 A.D.2d 687, 721 N.Y.S.2d 252). Further, the defendant's challenge to the legal

sufficiency of the evidence adduced at trial is unpreserved for appellate review (*see People v. Gray*, 86 N.Y.2d 10, 19, 629 N.Y.S.2d 173, 652 N.E.2d 919; *People v. Udzinski*, 146 A.D.2d 245, 250, 541 N.Y.S.2d 9). In any event, viewing the evidence in the light most favorable to the prosecution (*see People v. Contes*, 60 N.Y.2d 620, 467 N.Y.S.2d 349, 454 N.E.2d 932), we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt. Moreover, upon the exercise of our factual review power, we are satisfied that the verdict was not against the weight of the evidence (*see* CPL 470.15[5] ). The defendant's remaining contentions are without merit.

*People v. Hughes*, 298 A.D.2d 403, 751 N.Y.S.2d 379 (2nd Dept 2002). The New York Court of Appeals denied petitioner's leave to appeal on December 26, 2002. *People v. Hughes*, 99 N.Y.2d 559, 754 N.Y.S.2d 211, 784 N.E.2d 84 (2002).

Because the first ground in the instant petition is essentially drawn from the arguments in petitioner's first point on appeal, the claims stated in the first ground were satisfactorily presented to the state court in federal constitutional terms. Any confusion about whether the Appellate Division rejected the Brady claim in the first sentence of its opinion discussing the "*Wade* issue" "Contrary to the defendant's contention, the County Court providently exercised its discretion in declining to re-open the *Wade* hearing" is resolved unequivocally by the inclusion of that court's customary coda: "The defendant's remaining contentions are without merit." Thus, petitioner's *Brady* claim is fully exhausted and ripe for habeas review.

### B. *Applicable Legal Standards: Brady Violations*

Under the AEDPA standard set forth above, petitioner is entitled to habeas re-

lief only if the Westchester County Court's resolution of his *Brady/Giglio* claim "(1) was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The settled law for this claim is, of course, *Brady v. Maryland* and its progeny; this line of cases established that the Due Process Clause requires the prosecution to disclose evidence under its control that is favorable to the accused. *See* 373 U.S. 83, 87, 83 S.Ct. 1194 (1963). "To the extent that [a] prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation to disclose that evidence to the defendant." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir.1998) (Emphasis added). Violation of that constitutional duty warrants a new trial under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) where the Government has (1) failed to disclose (2) material evidence that was (3) favorable to the accused. The defendant must establish all three prongs of the test—favorable evidence, suppression and materiality—before there is any *Brady* violation. *Leka v. Portuondo*, 257 F.3d 89 (2d Cir.2001).

■ Evidence is "favorable" if it exculpates the defendant or if it could have been used to impeach other evidence relied on by the Government. *United States. v. Coppa*, 267 F.3d 132, 135 (2d Cir.2001). Evidence is "material" if it could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict, *Coppa*, *supra.*, *see also*, *United States v. Wong*, 78 F.3d 73, 79 (2d Cir.1996), or where its admission

"would probably lead to an acquittal." *United States v. Siddiqi*, 959 F.2d 1167, 1173 (2d Cir.1992). Materiality is assessed in light of the totality of the trial evidence. Where the evidence against the defendant is ample or overwhelming, withheld *Brady* material is less likely to be material than if the evidence of guilt is thin. *United States v. Gil*, 297 F.3d 93, 103 (2d Cir. 2002). The court must consider the net effect of suppressed evidence, not simply its item by item effect; cumulative materiality is the touchstone of *Brady* analysis. *Kyles v. Whitley*, 514 U.S. 419, 421, 436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

■ *Brady* requires disclosure of the material exculpatory evidence early enough so that the defense can make use of the information. *Leka v. Portuondo*, 257 F.3d 89 (2d Cir.2001). Suppression of exculpatory material violates due process irrespective of the good faith or bad faith of the prosecution. *Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999). However, if the defendant could have discovered the evidence on its own, exercising due diligence, then it will not be considered "suppressed" for *Brady* purposes.

■ To find a *Brady* violation, a court need not conclude that the undisclosed evidence would have been admissible at trial. Rather, a court need only conclude any of the following: (1) all or part of the document was admissible; (2) it could have led to the discovery of admissible evidence, or (3) it would have been an effective tool in disciplining a witness during cross-examination, by refreshment of recollection or otherwise. *United States v. Gil*, 297 F.3d at 104.

■ The standard for granting a new trial for *Brady* violations is whether there is a reasonable probability that there would have been a different result at trial if the evidence had been timely disclosed. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). As the Supreme Court stated, there is never a "real" *Brady* violation unless the non-disclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. *Strickler v. Greene*, 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). The non-disclosure (or belated disclosure) of Brady material deprives a defendant of a fair trial only where there is a reasonable probability that the Government's suppression affected the outcome of the case, *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), or where the suppressed evidence "put[s] the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

### C. Petitioner is not Entitled to Habeas Relief on his Brady Claim

The State Court's resolution of petitioner's *Brady* claim was not contrary to, and did not involve an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States. Nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

#### 1. Evidence Favorable to the Defense

■ Any evidence regarding Sherrica Tai's viewing of photographs at the 48th precinct in the Bronx, on January 30, 1998, is, arguably, favorable evidence for *Brady* purposes. The evidence is not exculpatory—even where, as here, all counsel agree that the photograph Sherica wanted to get a clearer look at was not petitioner.

There were, after all, three men involved in the crime. However, evidence that the victim identified a photograph as depicting someone that "could be" one of the three men, or that she "wanted to get a better look" at one of the men depicted in a photograph, is at the least fodder for impeaching the victim and the police witnesses on cross examination concerning, *inter alia,* the suggestiveness of the show-up. *See Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286, (1999). Thus, the prosecution had an affirmative duty to disclose all relevant information within its possession regarding the 48th Precinct viewing.

The first question is whether the prosecution suppressed any such evidence. The answer is no.

### 2. *No Suppression*

Information regarding Sherrica's viewing of photographs at the 48th Precinct was made available to the defense in sufficient time for the defense to make sufficient use of that information at trial. During Sherrica's testimony at the pretrial hearing, the prosecutor and the case detective learned for the first time that she may have been brought to the 48th Precinct to view photographs. The prosecutor said that he would inquire whether such a viewing ever took place.

Several days later (after the conclusion of the Wade and Sandoval hearings, jury selection and opening statements), the prosecution called its first witness, Mr. Tai, who testified about matters unrelated to any aspect of petitioner's identification. After Mr. Tai's testimony, the prosecutor reported that he had spoken with Sherrica and confirmed that she had in fact been brought to the 48th Precinct by Mount Vernon Detectives Fischer and Fatigate.

... I have learned that in speaking to [Sherrica] a combination of herself and her father, that there was a photograph there which she looked at among the many that she reviewed and said it looked like one of the people who robbed her. I assume based upon what she said that the photograph was an African American male. She said this to me this morning that she didn't make an identification. She simply said this photograph looks like the person. I'm providing that information to Mr. Tendy [defendant's attorney].... I also found out for the first time today that because I was trying, continuing to try to find out who the police officers were who took her down. That those police officers are Detective Daniel Fischer and Detective Fatigate whose first name I believe is Ronald. I didn't actually find that out until this morning, that they were the officers who took her down. I made a number of calls on Friday. They were not in, and all the people who I was able to get who were connected with the case said they didn't know who it was who brought them down. As we speak Detective Waters who told me he's not aware of any, he has no knowledge himself of any report that they filled in connection with that, is looking through his file and additionally calling people, Mount Vernon, to see whether or not there is any record of that.

(T:542–43). At that point, all the relevant facts about the "48th Precinct exculpatory/impeachment information" was disclosed to the petitioner, before any identification witness took the stand. *See United States v. Coppa,* 267 F.3d 132, 142 (2d Cir.2001). Petitioner knew that Sherrica was taken to the Bronx to view photographs and, although she did not make a positive identification, she did see a photograph that "looked like" the African American male robber.

Upon receipt of this information, petitioner's attorney asked that the Wade hearing be re-opened "so that I can see the book, see the photo, speak to the detective who supplied the book and the photo, speak to Detective Fischer." (T: 544). The Court responded to that request by asking the rhetorical question: "Are you entitled to a hearing when there is no identification?" *Id.* Counsel responded by asking the court to look "beyond the four confining walls of the issues of the hearing." *Id.* Defense counsel persisted in his request to open the hearing, suggesting that the police were intentionally covering up the 48th Precinct viewing: "I believe she was taken to there to make sure she didn't blow the ID." (T: 545). The prosecution offered to make Sherrica available to be interviewed and the Court asked petitioner's attorney whether he wanted to speak with her before she took the stand. (T: 547). Counsel declined the offer, stating that, "To speak to a witness out in the hallway kind of defeats the purpose of surprise of cross-examination." (T: 548–49).

After the next witness (Officer Clarke) finished testifying, the prosecutor produced the just-received fax transmission of Detective Fischer's report, which stated that Fischer brought Sherrica to view a "photo imaging computer" at the 48th Precinct and that she did not make a positive identification. The prosecutor offered the defense an opportunity to interview Detective Fischer. While petitioner's codefendant accepted the offer and interviewed Detective Fisher over the lunch break, counsel for petitioner declined that offer as well: "At this stage I prefer to speak to my witness under oath...."

That petitioner's counsel did not avail himself of the prosecution's offer to make Sherrica and Fischer available to be interviewed—a tactical decision to avoid educating the witnesses as to the focus of his cross-examination—does not diminish the fact that petitioner had the exculpatory/impeachment information in his possession and was offered the ability to develop it in time to be utilized during the trial. *See Coppa*, 267 F.3d at 142.

After the direct examination of Sherrica by the prosecution, petitioner's counsel asked for a continuance and renewed his application for the "photo" and the "New York City detective" who showed her the photos. The prosecution argued that there was no such photo but a computer that displayed photographic images, and that there was not necessarily a New York City detective present while she reviewed the display. The court denied the application for a continuance, stating: "In light of the circumstances, there is a lot of cross examination that can be done. If we develop anything worth recalling the witness, I'll direct that she be recalled for additional cross-examination." (T: 653).

Despite the court's invitation to cross-examine Sherrica about the 48th Precinct viewing, petitioner's attorney asked no questions about the 48th Precinct or whether she had ever seen any photo image of petitioner prior to identifying him on the street or whether anything influenced that identification. (*See* T: 655–691). And while Urbina's counsel did explore this area on cross, Sherrica simply reiterated that which the parties already knew: that she pointed out someone who looked like one of the robbers, that she "wanted to get a better look at" the image (T: 711–712), and that she did not remember to whom she told this (T: 713, 822). Indeed, on re-direct examination, Sherrica testified that she never saw any photographs at the 48th Precinct depicting *any* of the people involved in this crime (T: 750, 822) and that no one "*ever*" did or said anything to suggest that she identify a

particular individual (T: 822). (Emphasis added).

In light of trial counsel's tactical decision not to explore the circumstance of the 48th precinct viewing with Sherrica or Detective Fischer, petitioner's argument that the trial court should have granted a continuance until he received a copy of the "photograph" is disingenuous. The "photograph"—by all accounts, an image contained in a computer data base maintained at the 48th Precinct—was the property of either the New York City Police Department or the Bronx District Attorney. Neither the Westchester County District Attorney nor the Mount Vernon police was in possession of the computer image petitioner sought, and so could not have suppressed it. Indeed, there was no reason for law enforcement to save a photographic image that Sherrica failed to identify as one of the robbers, merely because she said it looked like one of the robbers. Having eschewed the opportunity to interview and/or cross examine Sherrica and Detective Fisher on the issue, petitioner never demonstrated what this "photo imaging computer" was or that the viewing of it was capable of reproduction. The trial court's denial of the continuance request—on the condition that Sherrica would be recalled if anything should come to light—was sensible and reasonable.

Hence, the record belies petitioner's allegation that "the facts hint that Ms. Tai may have identified another individual as the African American male, who participated in the crime, and the prosecution knowingly suppressed this identification ..." (Petitioners Memorandum, at 36). The evidence, developed under questioning at trial, was to the effect that Sherrica never identified anyone at the 48th Precinct. Upon learning about the 48th Precinct viewing, the prosecution made prompt inquiry, produced the single report generated as a result of the viewing and made all the relevant witnesses available for interview. Petitioner's failure to avail himself of the court's offer to allow counsel time to interview Sherrica and the detectives about the circumstances surrounding the 48th Precinct, does not render the court's offer an inappropriate remedy for the late disclosure. This is not *Leka*, where the prosecution provided late disclosure of the fact that a witness identified a man other than the accused as having committed the crime, so that pretrial disclosure was necessary for full exploration and exploitation by the defense. See *Leka v. Portuondo*, 257 F.3d 89, 101 (2d Cir.2001) There is no evidence that Sherrica identified anyone at the 48th Precinct. Both Sherrica's testimony and Fischer's report make clear that Sherrica made "no positive identification" at the 48th Precinct. Petitioner's suggestion to the contrary is sheer speculation.

To the extent that petitioner maintains his alternative argument that the police brought Sherrica to the 48th Precinct to view a photograph of petitioner, so that she did not later "blow the ID," that argument is also belied by the record. In colloquy with the trial court about how to respond to an unusual mid-trial note from the jury, asking whether Hughes was the man depicted in the 48th Precinct photograph, trial counsel stated that the photograph "clearly wasn't" that of petitioner (T: 833–34) and that, "I think based on everything that has been stated that there has been no indication that the photo she saw was Michael Hughes." (T: 839).

Given the minimal impeachment value of the 48th Precinct evidence and the trial court's willingness to allow defense counsel time to interview the relevant witnesses, disclosure of this information just prior to Sherrica's testimony was early enough so that the defense could make use of the information. *See Coppa*, 267 F.3d at 142.

### 3. *Materiality*

Even if there had been some impropriety in the viewing of photographic images at the 48th Precinct (which there was not) and even if the prosecution withheld that information (which it did not), the totality of the identification evidence and other evidence of petitioner's guilt was so compelling that introduction of the "suppressed" evidence would not have put the whole case in such a different light as to undermine confidence in the verdict or have "probably lead to an acquittal."

There was an ample independent basis for Sherrica's identification of petitioner as the robber who greeted her at the door, forced his way in, bound her and then remained in her immediate presence over a substantial time to watch over her while cohorts removed the safe and manhandled it down the stairs and into petitioner's waiting vehicle. This is not to say that petitioner's trial counsel and his codefendant's counsel did not conduct effective cross examinations, exposing inconsistencies between Sherrica's trial testimony and her prior testimony and statements. But even during cross examination Sherrica testified that she was sure Hughes was the man, "Because I was concentrating on Hughes the whole time." (T: 714). Although, Sherrica was grilled by both defense counsel about her identification at the time of arrest, she never equivocated as to the identity of the black male who held her captive at gunpoint: "You saw a male black who was later identified as Michael Hughes, correct? I know that was him." (T: 716).[6]

Additionally, there was considerable, compelling independent evidence of petitioner's guilt, including the fully inculpatory testimony of petitioner's accomplice, Falcones about the planning and execution of the robbery, detailing the role played by each of the robbers, including that of petitioner. Falcones provided details about, among other things: the various cell phone calls between the coconspirators in planning the robbery; how he was picked up in Hughes' white car on the morning of the robbery and that they used that car as the getaway car; how all three men went into the house, the girl on the first floor; that he and Urbina went upstairs to remove the safe; and how all three men went bact to his (Falcones) house to break open the safe and divide up the money. While Falcones was effectively impeached by the fact that he testified pursuant to an arrangement with the prosecution (though that arrangement left him with a felony plea and eight years in prison), his testimony was corroborated when telephone records were introduced establishing the calls between the three men that Falcones testified were made in the days leading up to the robbery.

The evidence further demonstrated petitioner's opportunity and plan flowing from his access to knowledge from the installers of the safe as to its location in he home of an affluent client. Petitioner's white Hyundai was located and found to contain black gloves, consistent with Sherrica's description that he had worn such gloves and drove from the scene in such car. Upon arrest, petitioner was also found to have thousands of dollars of cash on his person,

---

**6.** It should be noted that petitioner's argument in the state court proceedings that the Wade hearing should have been reopened to explore the 48th Precinct identification procedures was obviated by the trial testimony of Sherrica, establishing an independent basis for her identification of petitioner. Indeed, even when a petitioner establishes that procedures were unduly suggestive, a pre-trial Wade hearing is not even constitutionally required when the existence of an independent basis for the identification testimony is adequately explored at trial. *Dunnigan v. Keane,* 137 F.3d 117 (2d Cir.1998).

consistent with the proceeds of the robbery or a recent windfall. Of course, petitioner did not claim a windfall but said that the cash was a loan from a relative to cover outstanding taxes. But cross examination by the prosecution developed that the money tendered by a relative remained intact at another location. Indeed, petitioner's defense case (chiefly an alibi defense) was, generally, decimated by effective cross examination.

Hence, petitioner has not established a viable basis for his *Brady* claim.

### 4. *Request for a Hearing and Discovery*

██ In *Stone v. Powell*, 428 U.S. 465, 482, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), held that "[w]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim," that claim may not be litigated in a Federal habeas proceeding. The only exceptions are when "(a) the State has provided no corrective procedures at all to redress the alleged Fourth Amendment violations; or (b) the State has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process" (*Capellan v. Riley*, 975 F.2d 67, 70 (2nd Cir.1992)). As to former, it is beyond cavil that New York provides sufficient corrective procedures NYCPL 710.20 to 710.70 (*Capellan, supra*, 975 F.2d at 70 n. 1). As to the latter, to establish an "unconscionable breakdown," a petitioner must show that State courts "failed to conduct a reasoned method of inquiry into relevant questions of fact and law" and this regards the corrective process and not the outcome even if erroneous or one with which the Federal habeas Court disagrees (*Capellan, supra*, at 71). But, all the State must do is provide an "opportunity for full and fair litigation." If a defendant

fails to avail himself of that "opportunity," he cannot claim that he did not receive a full and fair hearing in State court (*McPhail v. Warden, Attica Correctional Facility*, 707 F.2d 67, 69 (2d Cir.1983)). Here, petitioner was offered the opportunity to elicit any concrete basis for suppression of identification by reason of the viewing of the photo images in the Bronx by questioning every involved witness before they took the stand. While petitioner's counsel declined, he reserved the option to question in such regard in cross-examination at trial. He did not do so. When the codefendant did ask questions about the 48th Precinct on cross-examination, the *Brady* issue was fully developed and, in the end, totally eviscerated.

Moreover, petitioner's request for discovery is controlled by 28 USC. 2254(e)(2), which states as follows (emphases supplied):

"If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall *not* hold an evidentiary hearing on the claim *unless the applicant shows that*

(A) the claim relies on -

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) *a factual predicate that could not have been previously discovered through the exercise of due diligence; and*

(B) the facts underlying the claim would be sufficient to establish *by clear and convincing evidence* that but for constitutional error, *no reasonable factfinder* would have found the applicant guilty of the underlying offense."

As the Supreme Court has recognized (*Williams v. Taylor, supra*, 529 U.S. at 433, 120 S.Ct. 1479), § 2254(e)(2) "raised the Bar" erected by the case upon which petitioner relies, *Keeney v. Tamayo-*

*Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). In support of his request for a hearing, petitioner incorrectly relies on cases stating pre-AEDPA standards.

As to "failed to develop" opening clause of the statute, a petitioner must make reasonable attempts to investigate and pursue claims in State court. (See, e.g., *Wilcox v. Hopkins,* 249 F.3d 720 (8th Cir. 2001); *Bragg v. Galaza,* 242 F.3d 1082 (9th Cir.), as amended, 253 F.3d 1150 (2001)). Petitioner cannot show cause for not taking the opportunities to preliminarily question Sherrica and Detective Fischer, other than the wholly insubstantial nature of his argumentative assertions of possible suggestive impact, or for not cross-examining on those issues, other than acceptance that pursuit of any such claim would be to no avail.

Petitioner also claims that the requirement of a "prima facie" case for relief before being afforded discovery under *Harris v. Nelson,* 394 U.S. 286, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969) was "clearly reject[ed]" in *Bracy v. Gramley,* 520 U.S. 899, 909, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997). Rather, what *Bracy* held was that the "broad discovery provisions of the Federal Rules of Civil Procedure [do] not apply in habeas corpus proceedings." *Bracy, supra,* at 904, 117 S.Ct. 1793. A habeas petitioner is entitled to discovery only upon a showing of "good cause" (Rule 6(a) of Rules Governing § 2254 Cases) which requires "specific allegations" of facts that demonstrate reason to believe that he is entitled to relief if the processes of discovery are used. *Bracy, supra,* at 908–09, 117 S.Ct. 1793; *Harris v. Nelson,* 394 U.S. 286, 300, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969); *Zettlemoyer v. Fulcomer,* 923 F.2d 284 (3rd Cir.), *cert. denied,* 502 U.S. 902, 112 S.Ct. 280, 116 L.Ed.2d 232 (1991); *Linares v. Senkowski,*

964 F.2d 1295, 1296 n. 1 (2nd Cir.), *cert. denied,* 506 U.S. 986, 113 S.Ct. 494, 121 L.Ed.2d 432 (1992); *Lynott v. Story,* 929 F.2d 228, 232 (6th Cir.1991); *Munoz v. Keane,* 777 F.Supp. 282, 287 (S.D.N.Y. 1991), *aff'd* 964 F.2d 1295.

"Good cause" certainly cannot lie when the predicate facts were already developed in State proceedings and petitioner making a Federal collateral attack merely seeks a second bite of the apple that he eschewed further developing despite repeated opportunities in the course of State proceedings.

II. *Improper and Prejudicial Admission of Evidence Claim*

In Ground 2 of the petition, petitioner asserts that during the cross-examination of his "fiancée, Lavonne Dunlap, the prosecutor questioned her, over objections, about a 'sawed-off' shotgun taken from her residence". The weapon was owned by her father who also testified at trial but was never questioned about it. This line of questioning was never initiated during direct examination and also no one was ever charged with having possession of this weapon. (Petition Attachment Sheet).

■ Petitioner's Point II on direct appeal claimed that the introduction of the sawed-off shotgun testimony was "improper, prejudicial and constituted reversible error." The claim was asserted solely in terms of State law and State evidentiary rules, with no suggestion of any Federal Constitutional claim. (R: 159–161). Hence, this claim is not exhausted. (28 USC § 2254(b)(1); *O'Sullivan v. Boerckel,* 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999)).

■ Even had it been presented in Federal constitutional terms to the State courts and in the current petition, this claim would remain one of error of State law and not a basis for Federal habeas

relief. *Supra,* Point I. A State court's evidentiary rulings, even if erroneous under State law, generally do not present constitutional issues cognizable in a habeas corpus petition. *See Crane v. Kentucky,* 476 · U.S. 683, 689, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) ("We . . . acknowledge our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by State trial courts"); *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *Jenkins v. Bara,* 663 F.Supp. 891, 899 (E.D.N.Y.1987). Minimally, "[i]n order to prevail on a claim that an evidentiary error deprived [a] defendant of due process . . . he must show that the error was so pervasive as to have denied him a fundamentally fair trial." *Collins v. Scully,* 755 F.2d 16, 18 (2nd Cir.1985); to like effect, *Estelle v. McGuire, supra,* 502 U.S. at 72, 112 S.Ct. 475; *Aponte v. Scully,* 740 F.Supp. 153, 158 (E.D.N.Y.1990).

■ Petitioner was not prejudiced by the evidence that his girlfriend's father owned a sawed-off shotgun. Despite the fact that petitioner was living in the father's home at the time, i.e., the place where the gun was kept, the jury was also clearly apprised of the fact that the gun did not belong to petitioner. Indeed, there was not even a suggestion that petitioner even knew about the gun or that he shared any responsibility for it. Consequently, the jury could not have construed the gun's presence in the apartment as bearing negatively on petitioner. The People elicited this evidence in order to discredit Conrad Dunlap, and the jury understood it as such. Indeed, the trial court unambiguously instructed the jury, at the time of the testimony, that "[t]here has been no charge against Mr. Hughes alleging, nor is it contended at all by the prosecution in this case, that this weapon, if you will, a sawed off shotgun was possessed by Mr.

Hughes." (T: 1305). The court further instructed the jury that this evidence was to be considered "only" for the purpose of judging the credibility of Lavonne and Conrad Dunlap, and that "it shall not be considered as any evidence against petitioner Michael Hughes" (T: 1305).

In light of the overwhelming evidence of petitioner's guilt, the collateral nature of the shot-gun evidence and the trial court's instruction regarding that evidence, even if it were error to admit such testimony (and I specifically find that it was not), the error was not of such magnitude as to have denied him a fundamentally fair trial.

III. *Improper Discharge of Juror Claim*

■ In Ground 3 petitioner alleges that the trial court improperly discharged a juror when a sick juror was replaced by an alternate without granting a continuance and "without any indication that the juror was gravely ill." (Petition at).

Petitioner pressed the juror issue in Point III on direct appeal, claiming that "the dismissal of the sworn juror was error and violated [petitioner's] Sixth Amendment Rights to a fair trial by a jury of his peers." This claim was among those rejected by the Appellate Division after its review of the· actual record as "without merit." *Supra.*

Indeed, New York State law permits the discharge of a sick juror and replacement by an alternate, in the very circumstances presented here. *See* NYCPL 270.35[2][a]. The trial had commenced on October 29, 1998. On Thursday, November 12, 1998, the court noted that a juror who was over 75 years of age, Gloria Smalls, was not feeling well and sat "a good deal of the time" with her head on her hand and her eyes closed while in the courtroom in the presence of the defendants and their counsel. (T: 1221–22).

Before the beginning of proceedings on the following morning, November 13, 1998, the court informed all counsel that it had, through its clerk, received a phone call from Ms. Smalls, who had indicated that she had been on prescription medication for a diagnosed flu since November 9, 1998 but her condition continued to worsen to the point that she was so disabled by fever and chills that she could not even leave her bed that morning to see a doctor and, while she hoped to be able to see her doctor that afternoon, was too ill to appear in court. (T: 1222).

In light of Ms. Smalls' inability to appear in court that day, the court afforded the parties the opportunity to be heard on whether Ms. Smalls should be dismissed. (T: 1224). Mr. Tendy submitted that Ms. Smalls was an important juror because she seemed very alert, though he agreed that he had also noticed her illness and that she had been "dragging" on the prior day, and requested a continuation until Monday, November 16, 1998 at 10:30 a.m. (T: 1224–25).

The court indicated that "because of her age and seriousness of her symptom and progress, or lack thereof, I have no indication that she would be available to us either this afternoon or Monday." (T: 1228). The court's clerk then added that he had asked Ms. Smalls "what the situation would be for Monday" and she stated "no reason to believe" that she would well enough to attend court even at that time. (T: 1228–29).

The trial court exercised the discretion vested in it under (CPL 270.35(2)), which governs the dismissal of a sworn juror and authorized a trial court to dismiss a sworn juror if it determines, *inter alia*, that the juror will be unable to serve due to illness. (CPL 270.35). Such dismissal is authorized as soon as the trial court determines through a reasonable inquiry that the ju-

ror will not appear within two hours of the scheduled time trial was to resume (CPL 270.35[2][a]; *People v. Jeanty*, 94 N.Y.2d 507, 706 N.Y.S.2d 683, 727 N.E.2d 1237). The court fully satisfied its statutory obligation to make that reasonable inquiry, afford the parties an opportunity to be heard and set upon the record the reasons for its decision. And since CPL 270.35(2) is not unconstitutional, there can be no claim of federal constitutional dimension that might warrant habeas relief.

Petitioner clearly does not show that the determinations of the State trial court and of the State appellate court in rejecting his claim of error in such regard were contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Even prior to the statutory protection of State court findings in the AEDPA (*supra*), the established Supreme Court precedent in this regard has long been that a trial court's finding that a sworn juror was not fit for further service is a factual determination that is entitled to a presumption of correctness unless unsupported by the record. *Marshall v. Lonberger*, 459 U.S. 422, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983); *Sanders v. Sullivan*, 701 F.Supp. 1000, 1002 (S.D.N.Y.1988); *see also Arizona v. Washington*, 434 U.S. 497, 513, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978).

Furthermore, to succeed on such a ground, a defendant must also show actual prejudice from the replacement, (*see, Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Hakeem v. Goord*, 2000 U.S. LEXIS 14927, *66–67 (S.D.N.Y. 2000)), which is by no means demonstrated.

To the extent that petitioner claims that the trial court should have interrupted the trial for a "continuance," the clearly established Supreme Court precedent is that the power to grant or deny a continuance is within the discretion of the trial judge,

and the decision will only be reviewed for an abuse of that discretion (*Avery v. Alabama*, 308 U.S. 444, 446, 60 S.Ct. 321, 84 L.Ed. 377 (1940); *Grotto v. Herbert*, 316 F.3d 198 (2nd Cir.2003). A habeas petitioner asserting this claim must demonstrate that State courts engaged in an objectively unreasonable application of such precedent and "[o]nly an *unreasoning and arbitrary* 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the [Constitution]" (*Drake v. Portuondo*, 321 F.3d 338 (2nd Cir.2003), quoting *Morris v. Slappy*, 461 U.S. 1, 12, 103 S.Ct. 1610 [1983] (emphasis supplied). Again, petitioner must also show that he was actually prejudiced by that result (*Hill v. Ozmint*, 339 F.3d 187, 197 (4th Cir.2003)). He has not done so.

### IV. *Insufficiency of the Evidence Claim*

 As his fourth ground, petitioner asserts that the evidence of his guilt was insufficient. Petitioner's Point IV on his direct appeal was that "The evidence presented did not establish defendant's guilt beyond a reasonable doubt." (R: 165–67). The Appellate Division found that:

"Further, the defendant's challenge to the legal sufficiency of the evidence adduced at trial is unpreserved for appellate review (*see People v. Gray*, 86 N.Y.2d 10, 19, 629 N.Y.S.2d 173, 652 N.E.2d 919; *People v. Udzinski*, 146 A.D.2d 245, 250, 541 N.Y.S.2d 9). In any event, viewing the evidence in the light most favorable to the prosecution (*see People v. Contes*, 60 N.Y.2d 620, 467 N.Y.S.2d 349, 454 N.E.2d 932), we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt. Moreover, upon the exercise of our factual review power, we are satisfied that the verdict was not against the weight of the evidence (*see* CPL 470.15[5] )"

*People v. Hughes*, 298 A.D.2d 403, 751 N.Y.S.2d 379 (R: 224).

While alternatively reaching the lack of merit of the claims made "[i]n any event," the Appellate Division's invocation of the procedural bar was an independent and adequate State ground for denial of relief that prevents habeas relief in the absence of demonstration of sufficient cause for that default and actual prejudice therefrom. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2nd Cir.1990); *McGann v. Kelly*, 891 F.Supp. 128, 135 (S.D.N.Y.1995). Petitioner makes no such showing. Neither does his contest to legally sufficient evidence demonstrate "a miscarriage of justice" (*Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986)), the further but "very narrow exception" to this barrier (*Sawyer v. Whitley*, 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269, 277 (1992); *McCoy v. Lockhart*, 969 F.2d 649, 651 (8th Cir. 1992)).

If there were no independent and adequate state procedural ground for the denial of habeas relief, petitioner would still not prevail.

Any defendant challenging constitutional sufficiency of evidence has a "very heavy burden" (*United States v. Rosenthal*, 9 F.3d 1016, 1024 (2nd Cir.1993)) of demonstrating that, upon "viewing the evidence in the light most favorable to the government," no rational trier of fact could have found petitioner guilty (*Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (emphasis original); *Young v. Abrams*, 698 F.2d 131, 135 (2nd Cir.1983); *U.S v. Canady*, 126 F.3d 352, 356 (2nd Cir.1997); *Green v. Abrams*, 798 F.Supp. 149 (S.D.N.Y.1992), *affd* 984 F.2d 41 (2nd

Cir.1993)). He must demonstrate that "the record is 'so totally devoid of evidentiary support that a due process issue is raised' (citations omitted)." *Bossett v. Walker,* 41 F.3d 825, 830 (2nd Cir.1994), *cert. denied* 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 to like effect, *Marshall v. Lonberger,* 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983); *United States v. Canady,* 126 F.3d 352, 356 (2nd Cir. 1997); *Fax v. Scully,* 90 Civ 7041(KJD) (SDNY, 4/3/91) at 9–10; *Reid v. Lacy,* 91 Civ 5779(PKL) (SDNY, 6/23/ 92). Even "testimony of a single, uncorroborated witness is generally sufficient to support a conviction." *Edwards v. Jones,* 720 F.2d 751, 755 (2nd Cir.1983); *McNish v. Miller* 99 Civ 2539(CM)(MDF) (SDNY September 13, 2000) at p. 2; *Brooks v. McGinnis,* 98 Civ 2467(CM)(GAY) (SDNY August 29, 2001), at pp. 10–11.

■■■■■ A "federal habeas court faced with a record of historical facts that supports conflicting inferences must presume... that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson, supra,* 443 U.S. at 326, 99 S.Ct. 2781. "In a habeas proceeding, additionally, there is a presumption that the jury resolved credibility issues in favor of the prosecution." *Brooks v. McGinnis,* 98 Civ 2467(CM)(GAY) (SDNY August 29, 2001) at p. 11, citing *Vera v. Hanslmaier,* 928 F.Supp. 278, 284 (E.D.N.Y.1996), quoting *Anderson v. Senkowski,* 1992 WL 225576 (E.D.N.Y.1992), *affd.* 992 F.Supp 320 (2nd Cir.1993). "Federal habeas courts are not free to reassess fact-specific credibility judgments by juries or to weigh conflicting testimony." *Dure v. Kelly,* 1992 WL 394173, 1992 United States Dist. LEXIS 19576, CV–90–4303 (EDNY opn. filed 12/10/92, at 8).

■■■■■ To the extent of the appellate argument made to and rejected by the Appellate Division that the verdict was against "the weight of the evidence"which comprises the currently asserted but procedurally barred (*supra*) claim there was "no credible evidence to disprove petitioner's alibi" and that "petitioner did not go to work in Manhattan on the day this crime took place"—such a ground is not available for assertion in a habeas petition. A challenge to "weight of the evidence" is clearly not of constitutional dimension and may not be furthered on appeal, even an appeal of a Federal conviction. *Maldonado v. Scully,* 86 F.3d 32, 35 (2nd Cir.1996); *Freckleton v. Senkowski,* 97 Civ 5958(RMB)(THK), Report & Recommendation, December 28, 1999, at p. 9, n. 1 (collecting cases).

To the extent petitioner is arguing that there is no evidence of his guilt, he is just plain wrong. The victim identified petitioner as one of the men who robbed her. One of petitioner's accomplices provided comprehensive details about how petitioner and his cohorts planned and carried out this crime, which is itself sufficient for *Jackson* purposes. The arguments made by petitioner about the credibility of Tai and Falcones were made at trial and rejected by the jury.

It was the jury's province to determine whether and to what extent to accredit the overwhelming evidence presented by the prosecution and whether and to what extent to accredit the version of petitioner's location at the time of the crime presented by the defense. It was the jury's prerogative to fully discredit the defense version of this issue, as engineered by the defendant.

### V. Ineffective Assistance Claim

Ground Five of the petition asserts ineffective assistance of counsel on the usual and customary basis that "Petitioner was never informed of any plea discussions,"

and "Trial counsel also mistakenly informed petitioner that his maximum sentence exposure would be 12½ to 25 years when in fact petitioner would be sentenced as a violent persistent felony offender and face 25 years to life." Counsel "also gave this misinformation to several of petitioner's family members."

The *prima facie* showing that must be made for relief on ineffective assistance grounds has been clearly explicated by the United States Supreme Court. A defendant must demonstrate a cognizable basis for relief, "acts or omissions" that reach constitutional dimension, "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and so egregious as to overcome a "strong presumption" that attorneys act within broad parameters of "reasonably effective representation." *Strickland v. Washington,* 466 U.S. 668, 689–90, 104 S.Ct. 2052, 80 L.Ed.2d 674; *United States. v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *Trapnell v. United States,* 725 F.2d 149, 153 (2d Cir.1983). The defendant must demonstrate the absence of strategic explanation for such failures. *Strickland, supra,* at 689, 104 S.Ct. 2052; *United States v. DiTommaso,* 817 F.2d 201, 215 (2nd Cir.1987). It is counsel's overall performance that controls, as assessed in a "highly deferential review" without retrospective criticism. *Strickland, supra,* at 687, 104 S.Ct. 2052; *Kimmelman v. Morrison,* 477 U.S. 365, 774, 381, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). The defendant must then demonstrate that any cognizable *Strickland* omission "actually had an adverse effect," a "reasonable probability" that verdict would have been different "but for" it and cannot be seen as a "just result." *Strickland,* at 682, 694, 104 S.Ct. 2052; *Kimmelman,* at 374, 106 S.Ct. 2574.

That considerable burden is all the more heightened when such a claim is repeated in a collateral attack under 28 USC § 2254. A *Strickland* analysis must be "doubly deferential when it is conducted through the lens of federal habeas." *Yarborough v. Gentry,* 540 U.S. 1, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam). Moreover, petitioner must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance, as "it is the habeas applicant's burden to show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Woodford v. Visciotti,* 537 U.S. 19, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002); see also *Sacco v. Cooksey,* 214 F.3d 270, 274–275 (2d Cir.), *cert. denied,* 531 U.S. 1156, 121 S.Ct. 1107, 148 L.Ed.2d 977 (2001); *Aeid v. Bennett,* 296 F.3d 58 (2d Cir.2002).

■ A *Strickland* analysis frequently begins with whether a defendant has satisfied the prejudice prong to the *prima facie* showing required for relief, which is often capable of simpler analysis and resolution. In that regard, the only submission is the conclusory assertion in petitioner's Memorandum (at 54–55) that "A defendant's knowledge of the sentencing exposure he faced by going to trial, and his knowledge of a beneficial plea offer enables him to make a crucial and well informed decision whether to plead guilty or to got [sic] to trial." While petitioner alleges he was misinformed in such regard, he does not hazard the assertion that he would have taken a plea had he been correctly advised in such regards. That he does not do so is understandable. As indicated by Mr. Tendy's letters, and never controverted by petitioner at any point, petitioner had been steadfast in his desire to go to trial through the point that the aforesaid telephone records were located and secured.

While the Court's analysis here need not proceed beyond the absence of *Strickland* prejudice, the record establishes that the prosecution never offered petitioner a plea; therefore there was no *Strickland* omission in the first instance.

The People never made petitioner a plea offer. Petitioner was a persistent violent felony offender. He was the ringleader who engineered the safe job, forced his way into the house, threatened the teenaged victim with a gun, bound her and kept her imprisoned at gunpoint while his cohorts removed the safe. The only plea offer the prosecution pursued was the one made to Falcones, who played a lesser role in the robbery than did petitioner and was the only one of the three robbers who did not have a prior felony conviction. Falcones had also given a videotaped statement in which he confessed and fully implicated petitioner and Urbina. Based on Falcones' relative culpability, his lesser criminal record, the prosecutions desire to avoid the looming severance motion· that would have to be dealt with as a result of Falcones' statement (the possibility of two separate trials), the People offered Falcones a not so lenient plea of eight years, conditioned on his inculpating his codefendants and testifying truthfully at trial.

The only support for that contention that the prosecution offered petitioner a plea comes from Judge Lange, the trial judge, who made a comment at petitioner's sentence about there having been "extensive discussions about a *possible* plea . . . ." (R: 242–44). This statement would form the basis for· petitioner's present claim that his trial counsel, Robert Tendy, Esq., was ineffective for failing to advise him of a "plea offer."

Petitioner first raised this ineffective assistance claim in state court, three years after his sentence, in a motion to vacate the judgment of conviction under New York Criminal Procedure Law § 440.10. In Exhibit C to that motion was Tendy's response to petitioner's inquiry to counsel about Judge Lange's remark about there having been plea negotiations. (R: 248–49). Tendy made clear that there were "never any extensive discussions regarding plea bargains" and "[n]o formal plea offer was ever made" as to petitioner himself. (R: 248). Tendy reported that at the early stage of the case before any motions were filed, the Assistant District Attorney "mentioned to me, again informally and not in front of Judge Lange, that he would *consider* 15 years in return for your plea and implication of the codefendant." *Id.*, (emphasis in original). "Despite the possibility of an offer, you and I, after discussing the strengths of your case, decided to go forward" *Id.* The next mention of a plea offer occurred during the trial in the office Assistant District Attorney, while Tendy was speaking to the prosecutor about the People's "ongoing effort to retrieve phone records"—the telephone records the prosecutor hoped would corroborate Gabriel's Falcones' inculpatory testimony. *Id.* In expectation that such records could be secured, the prosecutor then "mentioned that he would *consider* offering you 18 or twenty years in return for your plea and implication of the codefendant . . . this was not a formal offer." *Id.* Tendy had also reported and discussed this with petitioner—"you and I did discuss the fact that the D.A. was considering 18 or twenty years. This was in the context of a discussion we had about the phone records and whether or not they would be revealing and/or damaging. The final decision was to go forward and attempt to put the records in the proper light." *Id.*. As Tendy also noted in that letter, once the phone records were secured and introduced and did fully corroborate the inculpatory testimony of Falcones, the prosecutor did not even suggest that possibility of

a plea. *Id.* Finally, as to the cited comment by Judge Lange at sentencing, Tendy's letter reminded petitioner that, "when the judge made his statement at sentencing you looked at me and asked" in words or substance if "there were any plea negotiations?" and "I told you 'no,' because there was nothing even close ... I don't know why the Judge made his statement ... perhaps he was confusing you with another case. I did not correct him ... I saw nothing to be gained by arguing with him about plea negotiations that never took place." (R: 249). In his response to Tendy dated December 5, 2001, Exhibit F to the motion, petitioner acknowledged and thanked Tendy for this clarification of Judge Lange's comment about plea negotiations, stating "I was really concerned with the courts comment during sentencing and your letter clarified my curiosity on the matter." (R: 255).

In papers in opposition to the CPL § 440.10 motion, ADA Alexander Levine affirmed that his review of the file indicated that there was no plea offer to petitioner. He additionally affirmed that "[t]he Pink Sheet in the files of this matter maintained by the Office of the District Attorney indicate a possible plea offer to burglary in the first degree with a sentence as a persistent violent felony offender of 20 years to life. However, there is nothing in the files that indicate [sic] that this plea was ever conveyed to defense counsel." (R: 264).

Petitioner's also claims that "counsel, during pretrial stages, misl[e]d petitioner and his family that petitioner faced twelve and a half to twenty-five years if convicted. Upon this misinformation, petitioner elected to go to trial." (Memorandum at 51).

Petitioner's § 440 motion asserted that Mr. Tendy had estimated sentencing exposure that was less than that to which he was ultimately sentenced. Petitioner supported this claim by his Exhibit D to his motion, an affidavit by his wife, LaVonne Dunlap, who stated that, while being interviewed by Mr. Tendy to determine whether she had knowledge warranting her possible testimony, Tendy stated to her "that if Michael were to be found guilty at trial, he would be facing 12½ to 25 years in prison. I relayed this same information to Michael." (R: 251). Petitioner's motion also included as his Exhibit E an affidavit by his sister, Linda Hughes, stating that Tendy relayed to her from time to time during the pendency of he brother's case that he faced 12½ to 25 years in prison. Ms. Hughes says that it was not until the trial was nearing its conclusion that "Tendy realized my brother was facing 25 years to life." (R: 253). Exhibit F to the motion was petitioner' letter to Tendy dated December 5, 2001 relaying the aforesaid information from his wife and his sister and asking "do you recall when it actually was during trial that you realized I was facing 25 to life? According to my recollection, it was when the People introduced the telephone records into evidence ..." (R: 255–56).

Tendy's response to that inquiry was exhibit G to petitioner's motion. (R: 258–59). Tendy admitted that there was an early point when he was "not certain as to the maximum sentence. I not only remember this, I remember telling you in the jail that I was unsure as to that maximum sentence and that I would check it out." However, Tendy observed, this was prior to the filing of the pre-trial *omnibus* motion and before the ADA said he might consider a plea involving 15 years, which offer would have been an "absurdity" if petitioner was only subject to a 12½ year sentence, so that Tendy was aware "many months before trial" that the sentencing exposure on the case was 25 to life.

Tendy reiterated that the ADA merely made a "passing" comment as to possibly considering such a sentence and "no formal offer was ever made." Tendy noted that the plan of the defense was not to pursue a possible plea or to consider sentencing ramifications but to attack and defeat the charges, as it was his belief, shared by petitioner and "several attorneys I consulted regarding your case" that there was an excellent likelihood of acquittal and that view continued until it came to pass that the telephone records were located and introduced with devastating effect.

The Court is satisfied that Mr. Tendy did not withhold any plea offer from petitioner, that counsel was aware well before trial that petitioner was a persistent violent felon facing 25 years to life, and that petitioner's decision to go to trial had nothing to do with potential sentence exposure.

### VI. *Conclusion*

Based on the foregoing, the petition for a wit of habeas corpus is denied.

As Petitioner has made no substantial showing of the denial of a constitutional right, there is no question of substance for appellate review. Therefore, no certificate of appealability shall issue. 28 U.S.C. § 2253; see *United States v. Perez*, 129 F.3d 255, 259–60 (2d Cir.1997); *Lozada v. United States*, 107 F.3d 1011 (2d Cir.1997); *Rodriquez v. Scully*, 905 F.2d 24 (2d Cir. 1990). I certify, pursuant to 28 U.S.C. § 1915(a), that an appeal from this order would not be taken in good faith. *Coppedge v. United States*, 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).